Howard **MILLER,** Petitioner,

v.

**COMMODITIES FUTURES TRADING COMMISSION,** Respondent.

No. 98–70360.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 4, 1999

Filed Dec. 20, 1999

---

4. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Robert E. Thompson, San Francisco, California, for the petitioner.

Robert S. Zwirb, Assistant General Counsel, Commodity Futures Trading Commission, Washington, D.C., for the respondent.

Before: PREGERSON, NOONAN and O'SCANNLAIN, Circuit Judges.

NOONAN, Circuit Judge:

Howard Miller petitions for the review of a final order of the Commodities Futures Trading Commission (the Commission or the CFTC). Miller has been found to have committed fraud in soliciting customers in violation of § 4c(b) of the Com-

modities Exchange Act (the CEA or Act), 7 U.S.C. § 6c(b). The Commission has issued a cease and desist order, a revocation of his license, a lifetime ban on his trading on the commodities futures exchange, and a fine of $600,000. The Commission's case was begun in November 1991, based on actions between 1987 and 1989. The case has taken just eight years to reach this court, creating some doubt as to the deterrent effect of the Commission's efforts. Nonetheless, we find no basis to disturb the Commission's decision as to fraud or the imposition of sanctions, with one exception. We hold that the fine imposed by the Commission had no basis in the record and was therefore an abuse of its discretion. We remand for reconsideration of the penalty.

## FACTS AND PROCEEDINGS

From 1981 to 1991, Miller was an account executive of Siegel Trading Company, a futures commission merchant, registered with the CFTC and doing business in Los Angeles and Chicago. Miller himself was registered with the Commission as an AP or associated person engaged in the solicitation of customers' orders. Prior to joining Siegel, Miller had had no education or experience in trading commodity options. At Siegel he was an active trader and also appeared on television commercials for the firm, emphasizing the money to be made in options trading.

Between 1984 and 1989 Miller handled 347 accounts. According to the testimony of a CFTC investigator, nearly 80 percent of his customers lost money trading options. In the period January 1, 1987–July 31, 1989, losses by his customers were large. At the same time Miller was making money. His customers paid a commission of 40 or 45 percent of the options price, plus a $155 fee for initiating each option position, and a $155 fee to close out each position.

On November 19, 1991, the Division of Enforcement of the CFTC charged Miller with violation of 7 U.S.C. § 6c(b). Two years later, an Administrative Law Judge conducted hearings on the complaint. Seven of Miller's customers testified against him as follows:

### 1. *Lloyd Barnes*

Lloyd Barnes made numerous transactions between July 14, 1987 and July 18, 1990. Miller initially cold-called him, offered him Swiss francs, and said that if Barnes were to invest, Miller "pretty much could triple [his] money." Miller called Barnes three more times before Barnes agreed to buy. Miller claimed that 80 percent of his clients made money. Miller never told Barnes of the risk that he could lose all his money. Barnes told Miller that he spent most of his time traveling, so that he could not watch his investments, and Miller said he would watch the investments for Barnes. When Barnes declined to purchase an option on sugar, Miller called back an hour later, telling Barnes that by waiting an hour, Barnes had lost $1,000. When Barnes again declined, Miller called back twenty minutes later, offering Barnes the original price, even though the price had subsequently changed. Miller claimed that he could triple Barnes' money on that deal. In 1987, Barnes agreed to be Miller's customer.

The next day, by Federal Express, papers arrived. The normal process at Siegel was to require each customer to listen to a taperecording that warned of the risks of trading commodity options. The taperecording was played by a supervisor known as a verifier. By the time Barnes had a conversation with a verifier, he believed he already had a commitment to purchase. At the time of the sale, Barnes believed that he was purchasing the Swiss francs themselves, not an option. Miller did not discuss fees and commissions, and Barnes did not learn of the fees and commissions until his second or third statement. On several occasions, Miller used the word "guarantee," explaining to Barnes that if Barnes lost on a particular investment, Miller would match him dollar

for dollar. Barnes testified that he lost $35,000 through trading with Siegel through Miller.

### 2. Donald Kenneth Black

Donald Kenneth Black made numerous transactions through Siegel between October 28, 1987 and February 10, 1988. Black purchased options from Miller for the first time in October 1987. Black had no prior options experience, although he did have mutual funds. Miller called Black and had ten or twelve telephone conversations with him before Black sent Miller any money. Miller stated at the time that his clients were making large returns on their investments in gold and soy beans, doubling or tripling their investments. Miller stated that sometimes his customers could quadruple or quintuple their investments in short periods of time: sometimes in less than thirty days, and mostly in under ninety days. Miller claimed that due to his experience and the experience of his company, they only recommended the better options to their clients and anticipated large returns. Miller admitted that there was a risk of losing the amount of the investment; however, Miller indicated that total losses rarely occurred because Siegel monitored investments on a daily basis and sold them if their value was declining. Miller indicated that he was investing personally in the commodities he recommended. Miller said that an investor could make a much better return on commodities than in a savings account or mutual fund. Black testified that, at the time, he understood the options to be an investment.

When Black agreed to purchase an option, Miller sent out a messenger to pick up the certified check and to bring forms for Black's signature. Miller claimed that a certified check was necessary in order to make the trade that morning; even if he didn't pick up the check that morning, Siegel would front the funds to make the purchase until the check arrived. Miller stated that the price of the option was going up every minute. At that time, before reading the risk disclosure forms, Black believed that he had made a commitment to purchase the option. Black did not read the forms that the courier brought, since the courier arrived at 5 p.m. when Black's office was closing. Miller had told him that the risk disclosure statement was a formality, and that any risk was going to be minimized by Miller's expertise in recommending and monitoring options. Black believed that the purpose of the verification taping was to have a record of the transactions, although the verification taping indicated there was a risk that Black could lose his investment. At the time of purchase, Black understood that Miller would receive a $155 commission; however he did not understand that, before that commission was added, the price had been marked up 45 percent. When Black later learned how much the commissions were and questioned Miller, Miller explained that the commissions were necessary to cover the cost of the research.

Black purchased another eight or nine options from Miller. After his purchase of the second or third option, he realized that the options were losing money and purchased the additional options trying to break even. Black indicated that he had tried to liquidate options when their values were declining, but that Miller resisted liquidation because he felt that the options were going to go up. Black invested a total of about $21,000, and his losses were about $12,000.

### 3. Lee Patrick Cowan

Lee Patrick Cowan, a self-employed chiropractor, made numerous transactions through Miller between November 10, 1988 and April 12, 1989. Miller first called Cowan about a copper option. Miller claimed that Cowan could double or triple his money by the end of November or early December, and that it was almost a guaranteed deal. Miller did not mention the risk that Cowan could lose the money.

Miller claimed that in the previous year, all of his customers had made money. Cowan compared the Siegel commissions with those of Shearson Lehman prior to his initial purchase. When Cowan asked Miller why Siegel's commissions were substantially higher than Shearson Lehman's, Miller claimed that Siegel had the largest research unit looking at options. He said that Siegel's prices were higher because they gave their customers "the first bite" at the option, and, after the customers used the research, Siegel sold the research to other brokerage houses. Cowan agreed to purchase the option for $3,000 or $4,000. At the time, Cowan knew nothing about options. Miller indicated that there was some risk, but never indicated that a total loss was realistic.

Miller later called Cowan and convinced him to buy a second option in November. Miller told Cowan that another customer had bought $100,000 worth of the option, so that Miller could get Cowan a good deal on the option. In late November, Cowan purchased a third option, which Miller told him was for insurance on the other two options. Cowan did not understand that he could lose any money on this option and thought that this option was different than his other two options. Cowan invested a total of $11,000 and expected to have $33,000 at the end of his options.

Cowan later had a talk with a friend, who explained the nature of options. In early 1989, Cowan asked Miller what the options were worth at that time, and Miller said they were worth about $500. Cowan asked Miller to sell the options. Miller said that he could not, but gave no reasons. Cowan's options expired worthless.

#### 4. *Armand George Mezey*

Armand George Mezey did business with Miller from late 1987 or early 1988 until the end of 1988 or the beginning of 1989. Miller initially called Mezey. At the time, Mezey had already invested with Siegel in T-bonds and had lost all the money he invested. Miller convinced Mez-

ey that the reason he had lost money with his previous Siegel broker was that the previous broker had let the option expire. Miller assured Mezey that he would watch to make sure none of Mezey's options expired. Miller convinced Mezey that he was an expert, and that Mezey could recoup his losses by investing in certain options. Miller claimed that many of his other customers were investing heavily in these options and were making money. Miller said that he would invest in the options, if he was able, but claimed to be unable to invest. Miller indicated that in the past other customers had doubled or tripled their money in this particular investment. Mezey testified that, at the time of the initial sale, he did not really understand what an option was, nor did Miller explain options to him. When Mezey's options lost money, Miller would blame the loss on the economy and then mention another opportunity that would recoup Mezey's losses. Miller only advised Mezey to sell something when it had already gone down substantially in value. Miller suggested that Siegel's research department was extensive and had a good track record.

#### 5. *Michael Scully*

Michael Scully, an insurance attorney, had an account through Miller from January 1991 to May 1991. Miller cold-called him in 1991. Scully had no finance background and no investments except for $2,000 in an IRA. Miller indicated that they had spoken before about the Japanese yen, and that if Scully had invested as Miller had advised, Scully would have tripled his money. Scully indicated that Miller must have him confused with someone else because they had never spoken. Miller responded that they had spoken before, and that he wanted to sell Scully "a deutschemark." Scully did not, at that time, understand whether an actual deutschemarks or options on deutschemarks were being discussed. Miller explained that if a rating system moved up

six points on a particular T-bond, then Scully would triple his money, and Miller thought the rating would move even higher than that. Miller claimed that he would not steer Scully wrong because he made most of his money on repeat business. Miller indicated that, so far in 1991, he was making a killing for his clients, that the year before had been so-so, and that the year before that, he had made a killing for his customers. Miller did not mention his qualifications as a broker. Scully testified that Miller did not mention any risk that Scully might lose all his money.

When Scully indicated that he was interested in a T-bond, Miller sent a messenger with an article and forms. The messenger would not leave until Miller called Scully back. When Miller called back, he indicated that the T-bond had gone up another point, and that Scully had to get in immediately to guarantee his profit margin. Scully agreed.

When the disclosure form was read to Scully, he noticed that the disclosure of the risk involved in commodities was contrary to what Scully had understood from his conversations with Miller. Scully testified that Miller told him that the disclosure form was "a formality" drawn up by attorneys, but that the T-bond was a winner. Scully testified that when he signed the document he understood that commodities were riskier than stocks or mutual funds. Scully testified that when Miller told him of the cost of the T-bond option, Miller did not explain how much of the amount was fees and commissions. Scully learned that the commission rate was 40 percent from the verifier.

After purchasing the T-bond option, Scully called Miller later that day or the next day and indicated that he "wanted out," Miller told him that it was too late; the money had already been invested. Subsequently, after Scully lost the money he had invested, he wrote a complaint letter to Siegel, who, after some discussions, refunded the amount of Miller's commission.

### 6. *Eddie Timmons*

Eddie Timmons had an account with Siegel from approximately June 8, 1990 through May 31, 1991. Miller testified that in June 1990, Miller called him about buying cotton futures. Miller claimed that Timmons should be able to double or triple his money within 30 days, due to crop failure in Texas. Miller claimed that his other customers were doing well. Timmons agreed to buy. Timmons thought that he had made a commitment to purchase an option at the time when he said yes to Miller. Timmons could not recall whether the packet of information on futures trading arrived before or after he had made this commitment. When the verifier called Timmons, Timmons attempted to ask her questions, but she responded that it was not her job to answer questions. Timmons could not recall whether anyone from Siegel ever asked him whether he could sustain a loss of the funds he had invested. Miller claimed that he had been in the business for more than 20 years and had a good record. Before making his purchase, Timmons understood that options were riskier than stocks, and that he could lose his investment.

Timmons also purchased a cattle option on June 13, 1990. Miller had claimed that cattle always went up around July 4, and that two rancher long-term clients of his made money purchasing this option every year at this time. On one occasion, Miller called Timmons and said that he had just tripled his money and made $180,000. When Timmons, confused, said that he did not have any options at that time, Miller claimed to have gotten Timmons's number confused with another client, Ed Timmerman. Miller then offered Timmons a deal. Miller never told Timmons that he should sell an option. When Timmons complained to Miller that he was not making any money, Miller responded that Timmons just happened to be unlucky and that the rest of his customers were doing great.

### 7. *Robert Weaver*

Robert Weaver, a landscape architect, testified that Howard Miller cold-called him in 1988, introduced himself as the Howard Miller on television, and wanted Weaver to buy a contract on soybeans, which Miller described as a sure winner and a no-miss proposition. Miller claimed that he was buying such contracts himself, that all his clients were buying them, and that they were all making money. Weaver testified that Miller was very bold, "in that there was just an absolute certainty; guaranteed." Miller did not discuss any risks. Weaver bought the contract right away.

Miller claimed that Weaver had to send a check immediately, because the contracts run by three-month periods. Miller sent Weaver the papers after Weaver had sent his check, and Weaver filled out the forms without examining them. Miller did not explain what amount of the purchase price was fees and commissions. At the time the verifier called and explained to Weaver, for the first time, that he might lose all the money, he had already sent in his check and believed himself to have already purchased the option. Weaver believed the disclosure statement to be a "standard disclaimer" like " 'hazard to your health' on a pack of cigarettes." Weaver made about $300 from the first option, after Miller advised him to sell. Weaver subsequently purchased more options that Miller told him were sure money-winners. When Weaver would express reluctance to buy, Miller would tell him Weaver couldn't afford not to buy, and that he would get all his money back and more. Toward the end of the relationship, Miller told Weaver that Miller would loan him the money to purchase additional options. Weaver declined.

*The Defense.* Miller denied that he told customers they could double or triple their money, or that he guaranteed that they would profit. Jennifer Nicole Martin, his assistant at Siegel, testified that Miller explained all risks, commissions, and other relevant factors to his customers prior to their purchase of an option contract. Martin stated that she could overhear Miller's phone calls to his customers and never heard Miller make guarantees of profit. Miller also claimed that he informed his customers that more than 80 percent of all commodity speculators lose money. Miller also relied on the verifier's taperecordings and the disclosure of risk forms.

*The ALJ's Opinion.* On May 25, 1994, the ALJ issued his decision. *In re Miller* [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,084. The ALJ resolved the conflict in testimony by finding Martin and Miller not credible, characterizing the latter as "an unreliable and evasive witness" and finding the seven customers to have testified honestly. He held that Miller had "engaged in a scheme to cheat and defraud customers and to make large commission profits at the expense of his customers." Miller had made false, deceptive, or misleading statements of material fact, and he had failed to disclose material facts. He had violated 7 U.S.C. § 6c(b) and Commission Regulation 33.10, 17 C.F.R. § 33.10. Without further analysis, the ALJ ordered Miller to cease and desist from further violations, revoked his registration as an AP, banned him forever from commodity options trading and imposed a civil penalty of $200,000.

Miller appealed the ALJ's findings and sanctions. The Enforcement Division appealed the monetary penalty as inadequate. On June 16, 1995, the Commission affirmed the ALJ's findings as to liability and as to all sanctions except the civil fine, as to whose determination the ALJ was held not to have followed procedures for setting a civil penalty. Accordingly, the case was remanded to the ALJ to redetermine this amount. *In re Miller,* [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,440 (CFTC June 16, 1995).

On remand, the ALJ followed the procedure set out by the Commission in *In re Gordon,* [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,326

(CFTC Mar. 6, 1995), *aff'd without opinion sub nom. Gordon v. CFTR,* 86 F.3d 1169 (11th Cir.1996). The gravity of Miller's offenses was taken to be established. The ALJ accordingly looked to the benefit to Miller of his conduct and the loss inflicted on his customers by his conduct. The Enforcement Division argued that all his commissions from 1988 through 1991, totaling $637,771.91, should be attributed to his fraud and that all the losses of his customers from 1987 through July 1989, totaling $1,350,623, should also be attributed to his fraud. The ALJ rejected these contentions. He found no correlation established between Miller's violations and his gains or his customers' losses. The "broad assumption" made by the Enforcement Division that there was such a correlation did "not hold weight in a market where there is inevitably going to be one losing trade for every winning trade" and where dishonest advice could result in a profit and honest advice result in a loss. The ALJ held that only $100,000 of loss was established by the seven customer witnesses. He then proceeded to determine Miller's net worth, noting that under *Gordon* the civil penalty should not exceed it. Miller contended that he had a negative net worth, the Enforcement Division contended that it was the same as his commissions earned—$637,771.91. Without further analysis, the ALJ fixed Miller's net worth at $50,000 and assessed a penalty of $50,000. *In re Miller,* [1994–96 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,-722 (ALJ June 21, 1996).

Only Miller appealed. On March 12, 1998, the Commission decided his appeal, *In re Miller,* [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH), ¶ 27,297 (CFTC Mar. 12, 1998). The Commission noted that Miller had "not provided his tax returns for 1987, 1988 or 1989 and had failed to provide most of the financial records that were required under the subpoena such as check registers and records of expenditures;" he also provided no documentation of liabilities. The Commission held that Miller had waived the right provided by the statute, 7 U.S.C. § 9a, to have his net worth considered. The Commission found enough in the record to set his net worth as in excess of $600,000. Following its own precedents, the Commission held Miller's conduct in defrauding customers to have violated a core provision of the Commodities Futures Trading Act. His misrepresentations had been "egregious." His wrongdoing had followed a pattern extending "over several years." His misconduct had been intentional. He had not attempted to cure his violations, to make restitution to his victims or to cooperate with the authorities; his post-violation conduct aggravated his wrongdoing.

The Commission accepted the Enforcement Division's figures of $637,519.94 of benefit to Miller and $1,351,623 of losses of his customers attributable to his violations of the law. To reach these conclusions the Commission noted the testimony of the seven witnesses and declared: "There is no basis to conclude that Miller acted differently with the other numerous customers whom he solicited at Siegel." The Commission added that its estimate was "very conservative" because "it does not include the losses incurred during a significant period of Miller's misconduct."

The Commission assessed a civil penalty of $600,000. Miller sought a review of this decision of March 12, 1998 in this court. The Commission declined to stay its order pending our review.

## ANALYSIS

*Violations of the Commodities Futures Trading Act.* In his brief to this court, Miller attacks the finding that he violated the Act. It is not evident that his petition for review of the Commission's order of March 12, 1998 embraces this matter. The Commission's order noted that Miller's liability and the nonmonetary sanctions "were resolved in the first appeal to the Commission" and ."may not be relitigated." Hence the order of March 12, 1998 does not address these issues. As we

have reviewed the record, however, we note that the ALJ properly resolved the conflict of testimony by finding the customers credible and Miller and Martin not credible. There would be no basis for us to disturb these findings or the conclusion resulting from it that Miller engaged in fraud in violation of 7 U.S.C. § 6c(b) and Commission Regulation 33.10, 17 C.F.R. § 33.10, and that the non-monetary penalties are appropriate. That Siegel supplied a warning by taperecording would not have corrected Miller's numerous misrepresentations; nor would Siegel's apparent compliance with the disclosure requirements of Commission Regulation 33.7, 17 C.F.R. § 33.7. Miller's objection to the ALJ's evidentiary rulings in this appeal are not persuasive. *See Levine v. Refco* [Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,488 (CFTC July 11, 1989).

■ Miller alleges generally that "the ALJ's Rulings, Orders and statements made on the record during the hearing, make clear that the ALJ was biased against petitioner and/or his former employer Siegel, and he was predisposed to direct, interpret, and/or suppress the testimony adduced at trial in a manner that would deprive petitioner of his right to a fair and impartial hearing." To demonstrate judicial bias, petitioner must show that the source of the alleged bias is extrajudicial, or that the evidence of bias is pervasive. *See Olson v. Ulmer,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,987 at 37,627 (CFTC Jan. 23, 1991). To set aside an ALJ's findings on the grounds of bias, a party must show an extrajudicial source of bias, or pervasive bias that demonstrates "a deep-seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. U.S.,* 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Miller has alleged no specific facts that would support such a finding.

■ *The Monetary Penalty.* By appealing the ALJ's order, Miller leaped from the frying pan into the fire, and one can understand his dismay at his appeal resulting in a twelve-fold increase of his penalty. The Administrative Procedure Act, 5 U.S.C. § 557(b), however, invests the Commission with "all the power which it would have in making the initial decision." The Commission was free to decide that penalty de novo. *See Containerfreight Transportation Co. v. ICC,* 651 F.2d 668, 670 (9th Cir.1981). In reviewing the agency's decision we defer to its interpretation of the law entrusted to its enforcement. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Commission has power to assess civil penalties of up to $100,000 per violation. *See* 7 U.S.C. § 9.

■ We agree with the Commission that Miller's failure to respond with adequate records at the net worth hearing operated as a waiver of the right conferred by 7 U.S.C. § 9a to have his net worth taken into account in assessment of the penalty. *See In re Nelson Ghun,* Comm. Fut. L. Rep., [Transfer Binder 1984–1986](CCH) § 27,584 (CFTC May 2, 1985). Vital financial data was not disclosed by Miller.

■ A problem, however, has been created by the Commission's procedure in determining the gain and loss from Miller's fraud. Seven customers testified to Miller's fraudulent acts toward them—Barnes from July 1987 to July 1990; Black from October 1987 to February 1988; Cowan from November 1988 to April 1989; Mezey from late 1987 to early 1989; Scully from January 1991 to May 1991; Timmons from June 1990 to May 1991; and Weaver from May 1988 to February 1989. The Commission stated three assumptions to justify its estimates of Miller's gain and the total of his customers' loss: that he would have treated his other customers as he had the seven; that this treatment caused their losses; and that Miller had engaged in similar misconduct in the six years not touched on by the testimony of the seven customers. These three as-

sumptions in effect transferred the burden of proof to Miller so that he had to prove he had not defrauded the other customers and that fraud by him had not caused them substantial loss.

Nothing in the record established that the seven witnesses were representative of Miller's 347 customers, nothing shows that they were a statistically significant group. Indeed, there was evidence in the record to the contrary. The losses of the seven witnesses averaged $14,287 apiece. If this average held for the remaining 340 customers, they would have lost a total of nearly $5,000,000; but the Enforcement Division's own calculation for four years showed nothing so enormous even if the calculation was extrapolated to cover ten years. Therefore, the losses of the seven witnesses were not representative.

In the trading of options on commodities futures, as all agree, there are substantial risks. There are always losers. To attribute all customer losses to the fraud of the broker goes in the face of this fact. Similarly, to attribute all of Miller's income to fraud assumes that he never put a customer in the way of a profit and that never in four years of trading gave one piece of honest advice. The assumption is arbitrary.

The Commission can set a penalty as a deterrent. *See Lawrence v. CFTC,* 759 F.2d 767, 776 (9th Cir.1985). Doing so, the Commission is exercising the important and delicate governmental function of punishing illegal conduct. *Cf. United States v. Halper,* 490 U.S. 435, 448, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989). In the background are the Eighth Amendment's prohibitions, although constitutional restraints are not at issue here. In the foreground, and determinative, is the law against any exercise of power by a federal agency that is an assertion of arbitrary power rather than an act of reason grounded on the record before the agency. *See Motor Vehicles Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.,*

463 U.S. 29, 42–43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983).

On remand, the Commission is free to fashion a monetary penalty appropriate to the gravity of Miller's offenses and sufficient to act as a deterrent.

The petition for review is GRANTED. The case is REMANDED for the Commission to redetermine the monetary penalty.