Versión para imprimir



EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Comisionado de Seguros de Puerto Rico<br><br>    Peticionaria<br><br>        v.<br><br>Real Legacy Assurance Company (antes Royal & Sunalliance Insurance Puerto rico, Inc.)<br><br>    Recurrida | Certiorari<br><br>2010 TSPR 142<br><br>179 DPR ____ |

Número del Caso: CC-2005-1111


Fecha: 21 de julio de 2010

Tribunal de Apelaciones:

            Región Judicial de San Juan-Panel V

Juez Ponente:

            Hon. Carlos Rivera Martínez


Abogados de la Parte Peticionaria:

            Lcda. Ruth Martínez González

Abogados de la Parte Recurrida:

            Lcdo. Jesús M. Del Valle



Materia: Revisión Administrativa de la Oficina del Comisionado de Seguros de Puerto Rico


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Comisionado de Seguros de
Puerto Rico

    Peticionario

           v.

Real Legacy Assurance Company
(antes Royal & Sunalliance
Insurance Puerto Rico, Inc.)

    Recurrida

CC-2005-1111    Certiorari

Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

San Juan, Puerto Rico, a 21 de julio de 2010.

En esta ocasión nos corresponde determinar si el comportamiento incurrido por un oficial examinador durante una vista administrativa socavó la integridad del proceso administrativo y, en consecuencia, impidió que se garantizara una adjudicación imparcial.

I

En diversas fechas, Real Legacy Assurance Company (Real Legacy) sometió a la Oficina de la Comisionada de Seguros (OCS), al amparo del Artículo 12.090 del Código de Seguros de Puerto Rico,[1] ochenta y ocho (88) solicitudes para la aprobación de tipos

_____
[1] 26 L.P.R.A. sec. 1209.

recargados que serían aplicados a igual número de pólizas de condominios.[2] Fundamentó su petición en que éstos respondían a alegados aumentos en los costos de reaseguro.[3]

Real Legacy comenzó a utilizar provisionalmente los tipos recargados previo a que la Comisionada de Seguros los considerase y aprobara. Ello así, toda vez que está permitido comenzar a utilizar un tipo en exceso del inscrito, "siempre y cuando que dentro de los treinta (30) días a partir de la fecha en que tal tipo en exceso se usó por primera vez, se someta para la consideración y aprobación del Comisionado una inscripción de conformidad con lo dispuesto en [el Código de Seguros de Puerto Rico]".[4]

Sin embargo, tras varios requerimientos por parte de los funcionarios de la OCS en torno a la insuficiencia de la documentación que acompañó Real Legacy para justificar los tipos recargados, el 24 de septiembre de 2003 se efectuó una

---

[2] El propósito del Artículo 12.090 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1209, es permitir que un asegurador le solicite al Comisionado de Seguros utilizar sobre cualquier riesgo específico un tipo en exceso del inscrito aplicable. El concepto "tipo" "[i]ncluye, según lo requiera el contexto, bien la compensación a pagarse o cargarse por contratos de seguros, incluyendo también fianzas de fidelidad y garantía, o los elementos y factores que formen la base para [la] determinación o aplicación de la misma, o ambas cosas". Art. 12.030 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1203. Por otro lado, el término "recargo" se refiere al "incremento de la prima que tiene que abonar un asegurado para asumir un riesgo superior al normal". O. Greco, Diccionario de seguros, Buenos Aires, Ed. Valleta, 2004, pág. 177.

[3] El "reaseguro" es el "contrato en virtud del cual una institución toma a su cargo total o parcialmente un riesgo ya cubierto por otra o el remanente de daños que exceda de la cantidad asegurada por el asegurador directo. . . . Es un seguro de seguros." Greco, op. cit., págs. 175-176. En otras palabras, es el "[i]nstrumento técnico del que se vale una entidad aseguradora para conseguir la compensación estadística que necesita, igualando u homogenizando los riesgos que componen su cartera de bienes asegurados mediante cesión de parte de ellos a otras entidades". J. Castelo Matrán, Diccionario MAPFRE de seguros, Madrid, Ed. MAPFRE, S.A., 1988, pág. 228.

[4] 26 L.P.R.A. sec. 1209.

reunión a la que asistieron: la Supervisora de la División Actuarial de Propiedad y Contingencia de la OCS, Sra. Miriam Ortiz Rodríguez, la Comisionada Auxiliar de Supervisión y Cumplimiento de la OCS, Srta. Áurea López, y el Vicepresidente Asistente del Departamento de Líneas Comerciales de Real Legacy, Sr. Juan Méndez Rosado. Como parte de la reunión, las funcionarias de la OCS le orientaron al señor Méndez Rosado sobre la obligación que tenía Real Legacy de justificar los tipos recargados sometidos para su aprobación. A esos efectos, le proveyeron una lista de las pólizas de condominios para las cuales Real Legacy no había presentado toda la documentación necesaria que evidenciara los aumentos en los costos de reaseguro de forma tal que se justificasen los recargos solicitados y se colocase a la OCS en posición de autorizarlos.[5] En vista de ello, el señor Méndez Rosado se comprometió a proveer la documentación solicitada dentro del plazo de diez (10) días.

No obstante, el 27 de octubre de 2003 —transcurridos treinta y dos (32) días de haberse efectuado la reunión— la OCS le notificó a Real Legacy la determinación de desaprobar las ochenta y ocho (88) solicitudes sometidas al amparo del Artículo 12.090 del Código de Seguros. Fundamentó tal acción en que a esa fecha la aseguradora no había realizado gestión

---

[5] Sobre el particular, el Artículo 12.090 del Código de Seguros de Puerto Rico, *supra*, dispone que, como parte de la solicitud de utilizar un tipo recargado para cualquier riesgo específico, el asegurador "deberá someter evidencia demostrativa, según determine el Comisionado, de que dicha cubierta no se ha podido obtener a tipos sin recargos de aseguradores autorizados a suscribir dicho riesgo". Íd.

alguna referente a la entrega de la documentación necesaria para justificar las solicitudes.

Insatisfecho con esa determinación, Real Legacy presentó una solicitud de vista administrativa, la cual se celebró los días 15 y 26 de abril de 2004. Tanto la OCS como Real Legacy estuvieron representados por sus respectivos abogados. La señora Ortiz Rodríguez fungió como testigo de la OCS, mientras que el señor Méndez Rosado, quien fue anunciado como testigo de Real Legacy, nunca declaró. La aseguradora optó por someter su caso mediante un memorando de derecho. Así las cosas, ambas partes presentaron sus respectivos memorandos de derecho y el caso quedó sometido para su adjudicación.

En cuanto a la celebración de la vista, es pertinente destacar la manera en que el Oficial Examinador condujo los procedimientos llevados ante su consideración. De la transcripción de los procedimientos se desprende que la representación legal de Real Legacy y el Oficial Examinador que presidía la vista, argumentaron vivazmente en varias ocasiones los pormenores del caso, interrumpiéndose constantemente el uno al otro. Como parte de la avivada discusión, el Oficial Examinador en ocasiones realizó manifestaciones indicativas de que había asumido una posición respecto a los méritos de la reclamación sin haber culminado la presentación de la prueba. Además, hubo instancias en las que expresó cuál era el funcionamiento de la OCS y se posicionó como parte de ésta.

A continuación transcribimos algunas de las expresiones realizadas por el Oficial Examinador en el transcurso de la vista administrativa:

> ...no procede de esa manera. **Esta, esta oficina no actúa de esa manera.**
>
> . . . . . . . .
>
> ...es que, no, espere, espere, permítame. Y con todo el respeto que le tengo, Licenciado, es que, de verdad, no, **no puedo permitir que se, que usted plantee que estos documentos se están fabricando para los efectos de prevalecer en el caso de la Oficina.**
>
> . . . . . . . .
>
> ...transcurre el plazo de diez; no hacen nada. Transcurren más todavía, más tiempo todavía, un mes más; no hacen nada. **Lo único que se puede inferir de esto, Licenciado, es que su representado determinó, "Yo no tengo que entregar esto, así que yo no voy a hacer nada y yo lo voy a pelear después", punto. Eso es lo único que se puede inferir. ¿Qué más yo puedo inferir de eso?**
>
> . . . . . . . .
>
> Eso, lo único que se puede entender de eso, por ahora, quizás después se me ocurra algo, es que simplemente su regulado, **su representado, el regulado de esta Oficina, simplemente determinó, "Yo no voy a presentar nada. Yo voy a, eh, voy a objetar esa determinación de la Oficina, de que yo qui...yo quiero pre...yo tengo que presentar esos documentos y cuando la Oficina tome acción, pues yo contrataré a una representación legal que me defienda y objetaré esa determinación".** Eso es lo que hicieron, eso es lo que hicieron, porque si, si se reunieron, si, y si expresaron su determinación de, de entregar estos documentos y en esa reunión, eh, eh, acuerdan eso, ¿por qué ahora vienen a plantear que no tienen que presentarlo?
>
> . . . . . . . .
>
> ...el señor Méndez estableció su disposición de presentar estos documentos y aún así no hizo nada. No hicieron nada. **Pues, ¿qué, qué usted**

**pretendía que la Oficina hiciera? Eh, "vamos a darle treinta días más, vamos a darle cuarenta días más. Tenemos que tomar acción; la Oficina tiene que tomar acción, Licenciado, porque es que, eh, nosotros somos los reguladores y, entiendo yo, que de muy buena fe se le dio una oportunidad a su representado y su representado simplemente se cruzó de brazos y no hizo nada.** No hizo nada. Y entonces es cuando la señora Ortiz se ve obligada...

. . . . . . . .

...yo no soy juez administra... yo no soy juez administrativo. Yo voy a ser un, yo, yo lo que escribo es una recomendación de cómo se debe adjudicar las controversias en este caso. Y todos los abogados saben que los oficiales examinadores, en todas las agencias, no tiene la, no tienen la facultad de, de, de adjudicar. Esa facultad la delega el director, que es la Comisionada en estos momentos. Y si yo puedo, y yo puedo adjudicar a favor de su representado y si la, y si el director de una agencia evalúa diferen... eh, de forma diferente el expediente administrativo y la evidencia presentada, él está en toda la potestad de decir esa no es la, es, esa no es la adjudicación correcta, la adjudicación que va es ésta, **porque yo soy un oficial examinador y yo soy parte de esta agencia. Y aún cuando deba ser lo, el, completamente imparcial, yo tengo un caso ante mí, Licenciado, donde lo que se ve es que el regulador, al cual yo formo parte, con todo y que sea Oficial Examinador y sea un foro adjudicativo, le concedió oportunidad a su representado de cumplir con unos requerimientos y su representado, eh, le indicó a la Oficina que estaba en toda disposición de cumplir con esos requerimientos y no hizo nada.** Y entonces, ¿qué, qué tiene que hacer entonces la agencia?, eh, ¿dejar pasar el tiempo? No pue... tiene que, tiene que actuar, no puede quedarse cruzada de brazos. Y eso es lo que hizo la señora Ortiz, punto. Eh, "yo te di una oportunidad de que tú me pusieras en posición, no me pusiste. Pues, ¿qué, qué me, qué me dre... qué me resta por hacer? ¿Qué yo puedo hacer?". No, no, no veo, no, no puedo visualizar, eh, qué otra cosa puedo hacer.

. . . . . . . .

Okay, pues entonces cuando un... **cuando el testigo de usted se siente allí, yo, personalmente, le voy a preguntar, bajo juramento, si él, si do... si doña Miriam no le indicó que en, faltaban documentos para ella estar en posición de tomar la, la determinación y él le dijo a ella que se los iba a proveer. Y si me dice que no, o sea, tenemos un problema ahí.**

. . . . . . . .

Pero, pero la posición de la Oficina y la interpretación de la ley que le toca administrar, que es el Código de Seguros, es que tenía que, tenía que presentarlo. Y se le dio una oportunidad a su representado de presentarlo;... Pues, ¿qué, qué, qué podía hacer entonces la señora Ortiz? **No, no, yo no veo otra manera de que, de que ella pudiera hacerle saber a su representado que estaba incumpliendo con unas disposiciones de ley que le toca administrar a esta Oficina y tenía que tomar acción y la tu... y la hizo.**[6]

Tras la celebración de la vista administrativa, el 2 de septiembre de 2004, la entonces Comisionada de Seguros emitió la Resolución. Dictaminó que procedía confirmar la decisión de la OCS de desaprobar las ochenta y ocho (88) solicitudes de tipos recargados. Se fundamentó en que Real Legacy hizo caso omiso a los varios requerimientos que le realizó la OCS —en forma escrita y personal— a los fines de que sometiera la documentación necesaria para evaluar si se justificaba la aprobación de los tipos recargados. Gestión que, según expresó la representación legal de Real Legacy en la vista —así hecho constar por la Comisionada en la Resolución al remitir la expresión al récord de la vista

---

[6] Transcripción de la vista, apéndice, págs. 2151, 2161, 2268-2269, 2279-2280, 2284-2286, 2294, 2307 (énfasis suplido).

administrativa—, era una cuestión de "sencillo cumplimiento".[7]

Así las cosas, el 27 de septiembre de 2004, la aseguradora presentó una Moción de Reconsideración en la que solicitó que se dejara sin efecto la Resolución emitida. Sostuvo que le "perturba[ba] la forma y manera en que a marronazos se pretende cuadrar la ineptitud y desconocimiento de aquellos funcionarios de la OCS a cargo de llevar a cabo la política pública".[8] Además, al igual que alegó en su Memorando de Derecho, mediante el cual dio por sometido el caso, le imputó al Oficial Examinador parcialidad y "predisposición a proteger a sus compañeros de trabajo".[9]

Con el objetivo de demostrar la alegada "inexistencia de imparcialidad en todo el proceso",[10] advirtió que la Resolución se emitió sin haberse resuelto una moción mediante la que peticionó que se le hiciera entrega de la transcripción de la vista celebrada. Según expresó, la importancia de obtener la transcripción estribaba en que con el beneficio de ésta podría demostrar "las constantes interrupciones del Oficial Examinador y cómo surge del récord que su mente ya estaba hecha al momento de este

---

[7] Íd., pág. 2236.

[8] Moción de Reconsideración, apéndice, pág. 138 (presentada por Real Legacy ante la Comisionada de Seguros).

[9] Íd.

[10] Íd.

abogado comenzar a contrainterrogar a la Sra. Miriam Ortiz".[11]

Sin embargo, de los autos se desprende que el 14 de junio de 2004, antes de que la Comisionada emitiera la Resolución, el Oficial Examinador había emitido una Resolución Interlocutoria en la que denegó la petición de que se transcribiese la vista. Fundamentó la denegatoria en los siguientes términos: "Aunque reconocemos que el Asegurador puede solicitar que la OCS le provea copia de la grabación de los procedimientos efectuados en el caso de epígrafe, éste tuvo amplia oportunidad de así solicitarlo y no es hasta que este Foro concede un plazo final, para que el caso quede sometido, que el representante legal del Asegurador procede a radicar la solicitud".[12]

Así concretadas las alegaciones de Real Legacy en su Moción de Reconsideración, el 9 de noviembre de 2004 la Comisionada de Seguros emitió una Resolución en Reconsideración por medio de la cual denegó la solicitud de Real Legacy. Inconforme con la determinación de la agencia, Real Legacy acudió en revisión ante el Tribunal de Apelaciones. Adujo que había errado la Comisionada de Seguros al desaprobar las solicitudes de tipo recargado basándose en requisitos dispuestos en una carta normativa que tenía el efecto de extender el alcance de lo establecido en el Artículo 12.090 del Código de Seguros; al emitir una Resolución a base de la recomendación de un Oficial

---

[11] Íd., pág. 164.

[12] Resolución Interlocutoria, apéndice, pág. 70 (14 de junio de 2004).

Examinador prejuiciado y parcializado; y al hacer suya la recomendación de un Oficial Examinador que admitió prueba documental erróneamente.

Sostuvo que tanto la Resolución del caso como la Resolución en Reconsideración dictadas por la Comisionada le produjeron "un daño irreparable a la relación del asegurador con sus asegurados y son muestras inequívocas del abuso de poder y abuso del derecho ejercitado por la OCS en contra de [Real Legacy]".[13] Expresó que durante todo el proceso administrativo se puso en evidencia la parcialidad y prejuicio en su contra. En este sentido, manifestó que "[d]urante la vista afloró lo que a todas luces debe ser catalogado como una mente hecha o predispuesta del Oficial Examinador que no sólo interrumpió en varias ocasiones a la representación legal del asegurador [], sino que intervino directamente en la discusión del caso manifestando para el récord su posición sobre el mismo, todo ello en contra del asegurador".[14]

Asimismo, reiteró su planteamiento en cuanto a que el Oficial Examinador no dispuso de la moción en la que solicitó que se le transcribiera la vista, lo que a su parecer le creó un estado de indefensión debido a que no pudo hacerla formar parte del recurso de revisión presentado ante ese tribunal. Ahora bien, de los autos se desprende que el foro apelativo intermedio ordenó que se gestionara la

---

[13] Solicitud de Revisión, apéndice, pág. 205 (presentada por Real Legacy ante el Tribunal de Apelaciones).

[14] Íd., pág. 218.

regrabación de la vista administrativa para que Real Legacy preparara e hiciera entrega de una copia de su transcripción. Tras la OCS gestionar la regrabación de los procedimientos y ponerla a disposición de Real Legacy, ésta presentó original y copia de la transcripción de la vista.

Con el beneficio de la transcripción de la vista y la comparecencia de ambas partes, el Tribunal de Apelaciones revocó el dictamen de la Comisionada de Seguros y devolvió el caso ante la agencia para que celebrase una nueva vista ante un adjudicador imparcial. Concluyó que de una lectura de la transcripción de la vista se desprendía que hubo parcialidad por parte del Oficial Examinador en los procedimientos llevados a cabo ante su consideración. De esta forma, acogió las alegaciones de Real Legacy al dictaminar: "A través de nuestra lectura y análisis de las referidas transcripciones afloró en innumerables ocasiones la mente hecha y predispuesta del Oficial Examinador que no s[ó]lo interrumpió en varias ocasiones a la representación legal del Asegurador, sino que intervino excesiva y directamente en la discusión del caso manifestando para el récord su posición sobre el mismo".[15]

Ahora bien, de una lectura de la Sentencia emitida por el Tribunal de Apelaciones se desprende que éste colocó al Oficial Examinador en la posición de adjudicador, esto es, no bifurcó la figura del Oficial Examinador con la de la Comisionada de Seguros. A modo de ejemplo, examinemos las siguientes expresiones realizadas en la Sentencia recurrida:

---

[15] _Sentencia del Tribunal de Apelaciones_, apéndice, pág. 2340.

...luego de evaluar sus planteamientos, así como el derecho vigente, **procedemos a revocar la decisión del Oficial Examinador de la O.C.S.**

. . . . . . . .

...el 2 de septiembre de 2004, **la Oficial Examinadora de la O.C.S., emitió Resolución** en la que confirmó la determinación tomada por la O.C.S. contra el Asegurador.

. . . . . . . .

...el 9 de noviembre [de] 2004, **el Oficial Examinador a cargo del caso procedió a declarar sin lugar la Moción de Reconsideración** presentada por el Asegurador.

. . . . . . . .

...**las determinaciones del Oficial Examinador están fundamentadas en pasión, prejuicio y parcialidad, vulnerando el debido proceso de ley y el derecho a tener una adjudicación justa e imparcial.**

. . . . . . . .

...**resolvemos revocar la decisión del Oficial Examinador de la O.C.S.** y devolvemos el caso de epígrafe para la celebración de una vista que cumpla con el debido proceso de ley.[16]

Aún insatisfecha con este dictamen a su favor, Real Legacy presentó una Moción de Reconsideración ante el Tribunal de Apelaciones. En esencia, adujo que "jamás" podría garantizársele una adjudicación imparcial ante la OCS ya que la Comisionada de Seguros tuvo dos (2) oportunidades para corregir los errores del Oficial Examinador y no lo hizo, lo que a su entender era indicativo de que el prejuicio y la parcialidad proviene de ambos funcionarios. A base de lo anterior, peticionó la reconsideración de la

---

[16] Íd., págs. 2333, 2334, 2341, 2342.

Sentencia "a los fines de revocar en su totalidad la decisión de la OCS, sin concederle a esta Agencia una segunda oportunidad para corregir todos los errores y abuso de derecho cometidos en el presente caso".[17] Sin embargo, el foro recurrido no accedió a reconsiderar su dictamen en esos términos, por lo que denegó la Moción de Reconsideración presentada por Real Legacy.

La Comisionada de Seguros, por su parte, en desacuerdo con la Sentencia emitida por el Tribunal de Apelaciones, acude ante nos mediante una Petición de *Certiorari*. Alega que erró el foro recurrido al determinar que hubo parcialidad en la adjudicación de la controversia toda vez que la alegada parcialidad se le atribuyó al Oficial Examinador y no a la Comisionada de Seguros. En este sentido, aduce que "la Sentencia del Tribunal de Apelaciones está basada, totalmente, en la premisa equivocada de que fue el Oficial Examinador que celebró la vista, quien también adjudicó la controversia".[18]

Además, señala que erró el foro intermedio al revocar la determinación de la agencia sin examinar si las conclusiones de la Comisionada de Seguros estaban fundamentadas en la prueba presentada en la vista y en el expediente administrativo. Indica que, de haber analizado lo anterior, ese tribunal hubiera concluido que el dictamen de la Comisionada estaba fundamentado en prueba sustancial y

---

[17] <u>Moción de Reconsideración</u>, apéndice pág. 2349 (presentada por Real Legacy ante el Tribunal de Apelaciones).

[18] <u>Petición de *Certiorari*</u>, pág. 8.

era conforme a derecho. En fin, nos advierte que "[s]ostener la Sentencia del Tribunal de Apelaciones equivaldría a darle una nueva oportunidad a una parte, Real Legacy, que renunció a su derecho a defenderse, no presentó prueba documental ni testigos, y sometió el caso aduciendo que l[a] controversia era una de derecho".[19]

El 24 de febrero de 2006 expedimos el auto solicitado. Ambas partes han comparecido. Procedemos a resolver.

II

La Ley de Procedimiento Administrativo Uniforme (LPAU), Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. sec. 2101 *et seq.*, regula el procedimiento adjudicativo que llevan a cabo las agencias administrativas al entender en casos y reclamaciones individuales. El estatuto le garantiza a las partes involucradas el derecho a una notificación oportuna de los cargos o querellas; a presentar evidencia; a una adjudicación imparcial; y a que la decisión se base exclusivamente en el expediente.[20] De esta manera la LPAU incorpora las garantías mínimas del debido proceso de ley a los procedimientos adjudicativos administrativos, toda vez que mediante éstos se pueden ver afectados intereses propietarios o libertarios de los participantes.[21]

En vista de "que el objetivo de la adjudicación administrativa es proveer un sistema justo, práctico y

---

[19] Íd., pág. 17.

[20] 3 L.P.R.A. sec. 2151(a).

[21] Álamo Romero v. Adm. de Corrección, res. el 15 de enero de 2009, 175 D.P.R. ___, 2009 T.S.P.R. 6, pág. 14.

flexible, hemos reconocido que las normas del debido proceso de ley no se aplican dentro del campo administrativo con la misma rigurosidad que se aplican dentro de la adjudicación judicial".[22] Ahora bien, ello no implica que por tratarse de un proceso administrativo pueda obviarse el derecho fundamental de toda persona a ser oído antes de ser despojado de algún interés protegido.[23] La privación de alguno de estos derechos sin la concesión de una oportunidad de ser oído se considera "siempre ajeno al debido proceso".[24]

La audiencia que se realice a esos efectos debe ser llevada a acabo de manera imparcial. Ello constituye la esencia del debido proceso de ley en los procesos administrativos.[25] La vista en sí misma es el equivalente administrativo del juicio en los tribunales.[26] Debe ajustarse al requisito fundamental de que sea un proceso justo,[27] tal como se han conducido en los tribunales desde hace siglos.[28] Ahora bien, el hecho de que el proceso deba ser justo no implica que sea uno rígido e inflexible, sino que se ajusta a las exigencias constitucionales de cada contexto.[29] Por

---

[22] Almonte *et al*. v. Brito, 156 D.P.R. 475, 481 (2002).

[23] Rivera Rodríguez & Co. v. Lee Stowell, 133 D.P.R. 881, 889 (1993).

[24] Íd.

[25] Withrow v. Larkin, 421 U.S. 35, 46-47 (1975).

[26] Schwartz, op. cit., pág. 311.

[27] Rivera Santiago v. Srio. de Hacienda, 119 D.P.R. 265, 274 (1987); FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 143 (1940).

[28] Schwartz, op. cit., pág. 311; D. Fernández Quiñones, Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme, 2da ed., pág. 155.

[29] Marcano v. Departamento de Estado, 163 D.P.R. 778, 791-792 (2005).

ello, lo hemos catalogado como uno circunstancial.[30] En el mismo sentido, tampoco significa que el procedimiento será tan exhaustivo que excluya todo posibilidad de error.[31]

Para aumentar la eficacia y asegurar la uniformidad en la adjudicación de controversias, las agencias deberán adoptar un reglamento que regule estos procedimientos.[32] El formato de la audiencia podrá formar parte de los asuntos regulados. De haberse reglamentado, sus disposiciones no podrán contravenir las de la LPAU. Más aún, cuando el reglamento no establezca las pautas bajo las cuales se regirá la vista, la discreción que ostenta el funcionario que preside la vista encuentra sus límites en el propio estatuto. Ello así debido a que en la audiencia, al menos, se le tiene que garantizar a las partes "la oportunidad de responder, presentar evidencia y argumentar, conducir contrainterrogatorio y someter evidencia en refutación".[33] Y es que si a una parte no se le provee la oportunidad de rebatir los argumentos de la otra parte, el derecho a la vista sería inútil.[34]

La ley también le exige al funcionario que preside la vista que conduzca los procedimientos dentro de un marco de relativa informalidad, concediéndole a "las partes la

_____

[30] Íd., pág. 792.

[31] Mackey v. Montrym, 443 U.S. 1, 13 (1979).

[32] 3 L.P.R.A. sec. 2152.

[33] 3 L.P.R.A. sec. 2163(b).

[34] Morgan v. United States, 304 U.S. 1, 18 (1938).

extensión necesaria para una divulgación completa de todos los hechos y cuestiones en discusión".[35] Es desde esa perspectiva que está obligado a admitir y considerar toda evidencia o prueba que sea material y relevante al asunto ante su consideración.[36]

## III

La LPAU le confiere a los jefes de agencia la facultad de delegar su función de presidir las vistas adjudicativas administrativas.[37] La persona sobre la cual recae esa función la selecciona de acuerdo a su criterio personal. Cuando opta por delegar la función de presidir la audiencia, pero retiene la facultad de adjudicar, se entiende que a quien designa es a un oficial examinador.[38] En cambio, si delega ambas funciones, se entiende que nombra a un juez administrativo.[39]

En esos términos, la sección 3.3 del estatuto específicamente dispone:

> Toda agencia podrá designar **oficiales examinadores** para presidir los procedimientos de adjudicación que se celebren en ella, los cuales no tendrán que ser necesariamente abogados, particularmente cuando el procedimiento es uno informal.
>
> El jefe de la agencia podrá delegar la autoridad de adjudicar a uno o más

---

[35] 3 L.P.R.A. sec. 2163(b).

[36] J.A. Stein, G.A. Mitchell, B.J. Mezines, Administrative Law, 2009, vol. 4, cap. 30, sec. 30.01, pág. 30-2.

[37] 3 L.P.R.A. sec. 2153.

[38] Tosado v. A.E.E., 165 D.P.R. 377, 386 (2005).

[39] Íd.

funcionarios o empleados de su agencia. A estos funcionarios o empleados se les designará con el título de **jueces administrativos**.[40]

En vista de que ambas clasificaciones tienen en común la dirección de la audiencia, es indispensable que se seleccionen funcionarios bien cualificados ya que esa función conforma la base del procedimiento administrativo adjudicativo.[41] Si el funcionario que preside la vista no actúa de manera competente y ecuánime, las partes que acuden a ventilar sus casos ante la agencia saldrán insatisfechas con el procedimiento ya que sentirán que no se les ha hecho justicia.[42] Téngase en cuenta que es ante ese funcionario que las partes presentan su caso, por lo que, en lo referente a la dirección de la vista, constituye el equivalente administrativo a un juez.[43]

La figura del oficial examinador tiene a su cargo la crucial tarea de adjudicar los hechos en controversia durante el transcurso de la vista evidenciaria. Su cargo le exige recopilar, de manera integral, la evidencia presentada en los procedimientos, esto es, es el responsable de la formación del récord administrativo. De aquí su importancia

---

[40] 3 L.P.R.A. sec. 2153 (énfasis suplido).

[41] Butz v. Economou, 438 U.S. 478, 514 (1978).

[42] Schwartz, op. cit., pág. 327. Al respecto, pero desde la perspectiva del adjudicador, en Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 202 (1987), expresamos: "De todos los valores que informan la garantía del debido proceso, el valor de la percepción de la justicia es el que con mayor claridad dicta el uso de un adjudicador imparcial con criterios independientes".

[43] Véanse, Butz v. Economou, supra, pág. 513; C.H. Koch, Administrative Law and Practice, 1985, vol. 1, cap. 6, sec. 6.2, pág. 434.

como partícipe de los procedimientos pues queda de sí asegurar que se desarrolle un expediente administrativo que represente adecuadamente la postura de todas las partes.[44] Recuérdese que a las partes le asiste el derecho de que su caso se adjudique única y exclusivamente a base de lo que contenga el expediente.[45] Por ello, tiene el deber de desarrollar un récord claro, con mucha conciencia y transparencia para que cuando el adjudicador examine el caso en sus méritos, pueda revisarlo completamente *de novo* sin ninguna dificultad.[46] De esta forma se garantiza que el funcionario que tome la decisión final lo haga de manera independiente y objetiva, ateniéndose exclusivamente al expediente constituido mediante un proceso justo y libre de influencias.[47]

A esos efectos, está facultado para ordenar el descubrimiento de prueba, presidir la conferencia con antelación a la vista, determinar la evidencia que formará parte del expediente y emitirle al adjudicador una recomendación sobre la decisión que debe tomar a base de sus determinaciones de hechos y el derecho aplicable.[48] Y es que concluida la audiencia, el oficial examinador lo que produce es una recomendación de cómo adjudicar el caso, cuyo alcance

---

[44] Koch, op. cit., cap. 6, sec. 6.5, pág. 436.

[45] 3 L.P.R.A. sec. 2151.

[46] Stein, Mitchell, Mezines, op. cit., cap. 35, sec. 35.01, pág. 35-4; Koch, op. cit., cap. 6, sec. 6.5, pág. 437.

[47] Koch, op. cit., cap. 6, sec. 6.2, pág. 434.

[48] Íd., pág. 435.

y consecuencia depende de lo que disponga el estatuto o del poder que se le ha delegado.[49] Ello así, toda vez que existe la posibilidad de que el oficial examinador emita una recomendación o informe inicial dirigido al ente encargado de resolver formalmente el asunto, el cual puede ser aceptado o rechazado. Así como puede ser que este informe se considere como una decisión inicial independiente a la de la agencia, pero apelable ante ésta para que sea revisada o incluso revocada.[50]

El denominador común de ambas opciones es la deferencia que el adjudicador de la agencia le otorgará al informe del oficial examinador, pues sus recomendaciones gozan de gran respeto debido a la vasta experiencia que posee sobre los méritos del asunto.[51] Téngase en cuenta que el oficial examinador es quien ha delimitado los asuntos que están en controversia; ha tenido ante sí toda la prueba; ha adjudicado credibilidad; en fin, es quien ha formado el récord sobre el cual se basará el adjudicador para tomar la decisión final.

Sin embargo, a pesar de la encomiable función que realiza este funcionario, el jefe de la agencia es quien en última instancia formula la política pública implantada bajo

---

[49] Fernández Quiñones, op. cit., pág. 190.

[50] Íd.

[51] Íd.; véase además, Universal Camera Corp. v. NLRB, 340 U.S. 474, 495-496 (1951).

su administración.[52] Como consecuencia de lo anterior es que la facultad de decidir del oficial examinador está limitada.

Ahora bien, de lo que sí goza gran independencia el oficial examinador es sobre la manera de llevar a cabo los procedimientos que preside.[53] Como parte de esa discreción, tiene la potestad de, entre otras cosas, limitar el alcance del interrogatorio a los testigos; eliminar el testimonio de un testigo que se rehúsa a contestar de manera apropiada; y regular la forma en que un testigo testifica.[54] Incluso, puede llamar a testificar a un testigo a iniciativa propia, y cuestionar o contrainterrogar testigos traídos al procedimiento por cualquiera de las partes.[55]

Queda a su discreción establecer los límites de su participación al interrogar y contrainterrogar a los testigos.[56] Empero, tiene que ser muy cuidadoso en ese proceso ya que al interrogar a los testigos debe comportarse como un participante imparcial y no como un abogado que intenta establecer un lado u otro de la controversia.[57] En otras palabras, el oficial examinador no puede proporcionarle a una parte la asistencia legal que

---

[52] Fernández Quiñones, op. cit., pág. 190.

[53] Stein, Mitchell, Mezines, op. cit., cap. 35, sec. 35.01, pág. 35-4.

[54] Íd., sec. 35.02[3], págs. 35-16 a 35-18.

[55] Íd., págs. 35-20 a 35-22.

[56] Schwartz, op. cit., pág. 338.

[57] Íd.; Stein, Mitchell, Mezines, op. cit., cap. 35, sec. 35.02[3], págs. 35-22 a 35-23; e.g., Montgomery Ward & Co. v. NLRB, 103 F.2d 147 (8vo Cir. 1939).

generalmente debe proveerle su propio abogado.[58] Si cruza la línea que separa al juzgador del acusador, asume el riesgo de que todo el procedimiento se vea infectado por el germen de la parcialidad.[59]

IV

Sin duda alguna, un proceso justo ante un juzgador imparcial es un derecho básico de todo individuo.[60] La esencia de todo procedimiento adjudicativo, sea judicial o administrativo, radica en la celebración de un litigio justo ante un juzgador imparcial de los hechos.[61]

Ante una alegación de parcialidad en un procedimiento administrativo, el primer paso del análisis es identificar sobre qué asunto es el que se aduce la existencia de parcialidad.

Es por ello que las agencias y los tribunales deben estar alerta ante alegaciones de parcialidad por parte del oficial examinador sobre aspectos fácticos del caso.[62] Ello es así debido a que cuando el oficial examinador ha prejuzgado cuestiones o hechos específicos del caso, podría dar lugar a su descalificación.[63] La clave radica en identificar si del comportamiento exhibido por el oficial

---

[58] Stein, Mitchell, Mezines, op. cit., cap. 35, sec. 35.02[3], pág. 35-23.

[59] Schwartz, op. cit., pág. 338.

[60] In re Murchison, 349 U.S. 133, 136 (1955).

[61] Withrow v. Larkin, 421 U.S. 35, 46-47 (1975).

[62] Koch, op. cit., cap. 6, sec. 6.7, págs. 440-441.

[63] Stein, Mitchell, Mezines, op. cit., cap. 35, sec. 35.03[1], pág. 35-51; e.g., Am. Cyanamid Co. v. FTC, 363 F.2d 757 (6th Cir. 1966).

examinador se puede concluir que éste, previo a presentarse la prueba o durante el transcurso de los procedimientos, denota que con anterioridad al inicio del proceso había prejuzgado cuestiones específicas que inciden sobre la solución de la controversia.[64] A modo de ejemplo, procede la descalificación del juzgador de los hechos cuando se demuestra que éste ha hecho un compromiso previo en adjudicar los hechos de determinada manera.[65]

Debe quedar claro que el prejuicio de "cuestiones específicas" del caso no se refiere a que este funcionario haya demostrado una clara convicción en cuanto a su interpretación de las disposiciones legales aplicables o de la política administrativa impuesta por la agencia concerniente; precisamente ello se refiere a aspectos generales del caso.[66] De igual forma, estar meramente familiarizado con aspectos legales o fácticos generales sobre cuestiones relacionadas con el caso, por sí solo, no es demostrativo de que el funcionario está predispuesto a emitir determinada recomendación.[67] Más bien, para que se plantee con éxito la parcialidad, a los efectos de descalificar al oficial examinador, es necesario que se evidencie un compromiso previo de éste a obtener determinada conclusión en relación a cuestiones específicas del caso, esto es, por ejemplo, estar dispuesto a recomendar que el

---

[64] Koch, op. cit., cap. 6, sec. 6.7, págs. 442-443.

[65] Schwartz, op. cit., pág. 346.

[66] Koch, op. cit., cap. 6, sec. 6.7, págs. 442-443.

[67] Véase, Faultless Division v. Secretary of Labor, 674 F.2d 1177, 1183 (7mo Cir. 1982).

reclamante infringió la ley sin antes haber escuchado la prueba o sin que se hayan ventilado los hechos particulares en que se suscitó la controversia.

Ahora bien, ante una alegación de parcialidad sobre cuestiones específicas, es necesario examinar cuidadosamente el caso en cuestión toda vez que su éxito dependerá del verdadero perjuicio que acarrea y las circunstancias en que éste se presentó. Hay que tener en cuenta que las resoluciones de las agencias se consideran decisiones institucionales, por lo que la integridad del proceso se afianza ante el hecho de que son varios los funcionarios que intervienen en la solución de la controversia.[68]

En vista de que no es un solo funcionario el que interviene en el proceso adjudicativo, para que se consiga revertir la determinación final de la agencia, es necesario demostrar que la parcialidad demostrada por el oficial examinador influyó lo suficiente como para subvertir la integridad del proceso adjudicativo.[69] En otras palabras, tiene que haber incurrido en un comportamiento de un grado tan alto de favoritismo o antagonismo que hace imposible la

---

[68] Sobre el particular, en <u>Asociación Dueños Casas Veraniegas de la Parguera v. Tribunal</u>, 101 D.P.R. 875, 882 (1976), expresamos:

> La decisión administrativa es institucional en el sentido de que es la decisión de una agencia u organismo, y no la de un individuo ni la de los jefes de la propia agencia. . . . En el proceso administrativo la prueba se practica ante un examinador, éste u otro subalterno pueden cernir la evidencia, especialistas en diversas disciplinas del personal de la agencia pueden contribuir a la redacción de informes finales; y el jefe de la agencia, como cuestión de realidad, puede descansar tan pesadamente en el trabajo de esos subalternos al extremo de conocer poco o nada de los problemas presentes en muchos de los casos que se resuelven en nombre de la agencia.

[69] Íd.

solución justa del caso.[70] Expresiones de irritación, impaciencia, insatisfacción, molestia e incluso enfado por parte del funcionario que preside la audiencia, se ajustan a lo que en ocasiones muestra un hombre o una mujer normal; ello no configura parcialidad legal.[71]

La objetividad e imparcialidad del oficial examinador puede ser cuestionada con éxito si se demuestra que el prejuicio del oficial examinador contamina el proceso a tal grado que acarrea consecuencias fatales en la determinación final que en su día emita la agencia. La parte perjudicada podrá solicitar la descalificación del funcionario que preside la vista cuando éste se aparta de su función de juzgador de los hechos y actúa como acusador; cuando dirige los procedimientos de un modo que subvierte la integridad del proceso; o cuando se evidencia que ha prejuzgado cuestiones fácticas específicas.

Ante tal solicitud, el oficial examinador puede optar por descalificarse a sí mismo en vista de la seriedad de los fundamentos argüidos. De no recusarse de los procedimientos, le corresponde a la agencia evaluar si los fundamentos mediante los cuales se solicita la descalificación son meritorios o procede desestimar la petición.[72] La decisión

---

[70] E.g., Miller v. Commodities Futures Trading Comm´n, 197 F.3d 1227, 1235 (9no Cir. 1999); Meadows v. SEC, 119 F.3d 1219, 1228 (5to Cir. 1997) (ambos citando a Liteky v. United States, 510 U.S. 540, 555-556 (1994)).

[71] Rollins v. Massanari, 261 F.3d 853, 858 (9no Cir. 2001) (citando a Liteky v. United States, supra, págs. 555-556).

[72] Téngase en cuenta que cualquier asunto que no haya sido traído ante la consideración de la agencia, no podrá ser objeto de revisión por el

que tome la agencia se tiene que hacer formar parte del expediente administrativo, pues la negativa de ésta para conceder la descalificación no detendrá los procedimientos.[73]

La revisión judicial sobre esa denegatoria procederá únicamente una vez la agencia adjudique el caso en sus méritos.[74] El tribunal examinará si la alegada parcialidad del oficial examinador lo hacía descalificable. Como hemos establecido, ello dependerá de la gravedad y el tipo de parcialidad acaecida en el proceso, esto es, si ésta tuvo el efecto de socavar la integridad del procedimiento adjudicativo. Tras determinar que era descalificable, se examinará integralmente el récord administrativo para concluir si la parte que la peticionó se perjudicó por ese error al no poder consignar adecuadamente su postura respecto a los méritos del procedimiento adjudicativo. De esta forma, la revocación de la decisión administrativa procederá exclusivamente en los casos en que la agencia erra al no descalificar al funcionario que presida la vista, y a

_____

tribunal. Garage Rubén, Inc. v. Tribunal Superior, 101 D.P.R. 236, 242 (1973).

[73] La norma que impera en la jurisdicción federal está establecida en términos similares. A esos efectos, el *Administrative Procedure Act*, 5 U.C.S. sec. 551 *et. seq.*, dispone:

> The functions of presiding employees and of employees participating in decisions . . . shall be conducted in an impartial manner. A presiding or participating employee may at any time disqualify himself. On the filing in good faith of a timely and sufficient affidavit of personal bias or other disqualification of a presiding or participating employee, the agency shall determine the matter as a part of the record and decision in the case.

> 5 U.S.C. sec. 556(b).

[74] 3 L.P.R.A. sec. 2172; véase, Tosado v. A.E.E., *supra*, págs. 384-385.

su vez ello sea la causa de que, en perjuicio del solicitante, la agencia haya adjudicado erróneamente el caso ante su consideración.[75]

Téngase presente que "debemos otorgarle deferencia a las determinaciones de los organismos [administrativos] si están sostenidas por evidencia sustancial que conste en el expediente administrativo".[76] Y es que "[l]as determinaciones realizadas por las agencias administrativas merecen gran consideración y respeto".[77] De hecho, "los procedimientos y decisiones de un organismo administrativo tienen a su favor una presunción de corrección y regularidad".[78]

V

Luego de un examen exhaustivo y minucioso de la transcripción de la vista, somos del criterio de que, a pesar de que en el presente caso el oficial examinador realizó manifestaciones indicativas de su postura respecto a los méritos de la controversia, en ocasiones se posicionó como parte de la OCS y participó del proceso interrogando al testigo, esas actuaciones no socavaron la integridad del proceso. Y es que tanto Real Legacy como la OCS pudieron establecer adecuadamente sus posturas respecto a los méritos del procedimiento adjudicativo ventilado ante el oficial

---

[75] Attorney General´s Manual on the Administrative Procedure Act, preparado por el Departamento de Justicia de los Estados Unidos de América, Tom C. Clark, Secretario de Justicia, 1947, sec. 7(a) Presiding Officers, http://www.law.fsu.edu/library/admin/1947vi.html

[76] Residentes Pórticos v. Compad, 163 D.P.R. 510, 526 (2004).

[77] Gutiérrez Vázquez v. Hernández Hernández, res. el 1 de octubre de 2007, 172 D.P.R. ___, 2007 T.S.P.R. 174, pág. 17.

[78] Residentes Pórticos v. Compad, supra, pág. 526.

examinador. En consecuencia, se desarrolló un récord claro, con mucha conciencia y transparencia, por medio del cual la Comisionada de Seguros pudo haber revisado el caso completamente *de novo* sin ninguna dificultad. No hubo ningún impedimento para que ésta pudiera adjudicar de manera independiente y objetiva.

Téngase en cuenta que la LPAU le confiere a la Comisionada la facultad de delegar su función de presidir las vistas adjudicativas administrativas.[79] En este sentido, debe quedar claro que, a diferencia de lo razonado por el Tribunal de Apelaciones, quien adjudicó el caso de autos fue la Comisionada, no así el oficial examinador. Aquélla optó por delegar únicamente la función de presidir la audiencia, pero retuvo la facultad de adjudicar. Siendo así, la autoridad adjudicativa del oficial examinador encontró su límite en las disposiciones de la LPAU, por lo que se circunscribió a emitir una recomendación de cómo adjudicar el caso.[80]

Por otro lado, la OCS estuvo representada adecuadamente por su abogado en la vista. Las preguntas del oficial examinador fueron similares a las que generalmente se le permite realizar a los jueces de primera instancia en

---

[79] 3 L.P.R.A. sec. 2153.

[80] El Reglamento Núm. 5330 de 14 de noviembre de 1995 de la OCS derogó la Regla I del Reglamento del Comisionado de Seguros, la cual disponía las normas para regular los procedimientos de investigación y adjudicación. De esta forma, dispuso que los procedimientos adjudicativos que lleve a cabo la OCS serán dirimidos a tenor con la LPAU y conforme a la jurisprudencia aplicable.

sus salas. La mayoría de las preguntas que realizó, las hizo con el objetivo de clarificar y agilizar los procedimientos ante la agencia. No actuó como un abogado que intenta establecer un lado u otro de la controversia, sino que cada vez que intervino en el interrogatorio de la testigo de la OCS, culminaba sus cuestionamientos solicitándole al abogado de la aseguradora que le ilustrara si concluir de determinada manera era adecuado. Incluso, le peticionaba que de ser esa posición errada, le argumentara el lado contrario con el objetivo de tener una visión más completa de los méritos de la reclamación.

Ciertamente, los cuestionamientos del oficial examinador en ocasiones fueron extensos e incisivos, pero no alcanzaron el nivel que lo colocó en la posición de abogado de la OCS como aduce Real Legacy, sino que esa agencia estuvo representada por su respectiva abogada. El hecho de que haya incurrido en expresiones de irritación, impaciencia, insatisfacción, molestia e incluso enfado, no configura la parcialidad legal que nos obligaría a anular el procedimiento; más bien se ajusta a lo que en ocasiones muestra un hombre o una mujer normal. En fin, no incurrió en un comportamiento de un grado tan alto de favoritismo o de antagonismo hacia alguna de las partes que imposibilitó que se alcanzara una solución justa del caso.

En específico, examinado el comportamiento exhibido por el funcionario que presidió la vista, no puede derivarse que éste, previo a la celebración de la vista, prejuzgó los

hechos y el derecho aplicable de tal forma que su recomendación había sido concebida de antemano. En otras palabras, no puede resolverse que previo a presentarse la prueba o durante el transcurso de los procedimientos, éste haya dado indicios de que con anterioridad al inicio del proceso había prejuzgado cuestiones específicas que inciden sobre la solución de la controversia. Como hemos establecido, prejuzgar cuestiones específicas no se refiere a que haya demostrado una clara convicción en cuanto a su interpretación de las disposiciones legales aplicables o de la política administrativa impuesta por la agencia concerniente.

En consecuencia, considerando las circunstancias particulares de este caso, el proceso acaecido se ajustó al requisito fundamental de que fue uno justo. Téngase en cuenta que en los procedimientos administrativos está permitido que la vista se conduzca dentro de un marco de relativa informalidad. Dentro de esa informalidad, el oficial examinador que presidió la vista le concedió a "las partes la extensión necesaria para una divulgación completa de todos los hechos y cuestiones en discusión".[81] Admitió y consideró toda la evidencia o prueba material y relevante al asunto ante su consideración. Incluso, la razón por la cual el testimonio del señor Méndez Rosado no formó parte del expediente administrativo fue precisamente porque el propio

---

[81] 3 L.P.R.A. sec. 2163(b).

abogado de Real Legacy optó por someter el caso sin la declaración de éste, quien figuraba como su único testigo.

A la luz de lo anterior, nos hemos convencido de que no estamos ante una situación en la que el oficial examinador procedió de manera arbitraria y caprichosa. No existe una alegación fáctica específica que indique parcialidad o prejuicio descalificador por parte de este funcionario, ni lo que es más importante y decisivo, de parte de la adjudicadora, la Comisionada de Seguros.[82] Tal proceder sin duda alguna hubiera conllevado la nulidad del proceso, pero ese no es el caso de autos.

## VI

Por los fundamentos que anteceden, y en vista de que hemos concluido que el oficial examinador condujo los procedimientos de manera justa, revocamos el dictamen del Tribunal de Apelaciones y lo devolvemos a ese foro para que resuelva los restantes señalamientos de error que tuvo ante su consideración.[83]

Se dictará Sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

---

[82] E.g., Henríquez v. Consejo Educación Superior, *supra*, pág. 211.

[83] En vista de que nuestro derecho es uno rogado, nos hemos limitado a resolver la controversia planteada ante nos, esto es, si la conducta demostrada por el oficial examinador al presidir la vista socavó la integridad del proceso impidiendo así que la Comisionada de Seguros tuviera la oportunidad de adjudicar de manera imparcial. S.L.G. Lloréns v. Srio. Justicia, 152 D.P.R. 2, 8 (2000).

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Comisionado de Seguros de
Puerto Rico

     Peticionario

        v.                   CC-2005-1111

Real Legacy Assurance Company
(antes Royal & Sunalliance
Insurance Puerto Rico, Inc.

     Recurrida

**SENTENCIA**

San Juan, Puerto Rico, a 21 de julio de 2010.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, revocamos el dictamen del Tribunal de Apelaciones y lo devolvemos a ese foro para que resuelva los restantes señalamientos de error que tuvo ante su consideración.

Así lo pronunció y manda el Tribunal y certifica la Secretaria del Tribunal Supremo.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo