Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| CÁNDIDO RAMOS ALVERIO<br><br>Parte Recurrida<br><br>v.<br><br>CONDOMINIO CASTILLOS DEL MAR Y SU PRESIDENTE<br><br>Parte Recurrente | KLRA202500202 | Revisión administrativa procedente del Departamento de Asuntos del Consumidor<br><br>Querella Núm.: C-CAG-2021-0002401<br><br>Sobre:<br>Ley de Condominios de Puerto Rico, Ley Núm. 129 de 16 de agosto de 2020 |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores

Rodríguez Flores, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 30 de septiembre de 2025.

Comparece mediante una *Revisión de Decisión Administrativa*, ante este Foro, el Consejo de Titulares del Condominio Castillos del Mar y su Presidente (el Consejo de Titulares o parte recurrente) en la que solicitó que revoquemos la *Resolución* emitida el 10 de febrero de 2025, notificada el 11 de febrero de 2025, por el Departamento de Asuntos del Consumidor (DACO).[1]

Por medio de dicha *Resolución*, el DACO resolvió que el Consejo de Titulares incumplió con su deber de conservar y mantener los elementos comunes, particularmente el techo del condominio y, por tanto, debía resarcir al señor Cándido Ramos Alverio (el señor Ramos Alverio o recurrido) por los daños ocasionados a consecuencia de ello. Además, el DACO ordenó que

---

[1] Apéndice del Recurso de Revisión Judicial, Anejo 1, págs. 1-17.

la parte recurrente indemnizara al señor Ramos Alverio por la cuantía de $32,786.62.

Por otro lado, el Consejo de Titulares solicitó la paralización de los efectos de la *Resolución* hasta tanto se emita la presente *Sentencia*.

El 20 de junio de 2025, emitimos una *Resolución* en la que ordenamos la paralización de las *Resoluciones* emitidas por el DACO el 11 de febrero de 2025 y el 10 de marzo de 2025.

El 16 de septiembre de 2025, el señor Ramos Alverio radicó ante nos el *Alegato en Oposición a Recurso de Revisión*.

Examinados el recurso, la oposición y los documentos que conforman el apéndice, a la luz del derecho aplicable, confirmamos la *Resolución* recurrida.

## I.

El 9 de marzo de 2021, notificada el 15 de marzo de 2021, el señor Ramos Alverio presentó una *Querella* ante el DACO en la que argumentó que la parte recurrente incumplió con su deber de conservar y mantener los elementos comunes del Condominio.[2] Ante ello, el recurrido sostuvo que la falta de mantenimiento generó varias filtraciones en el techo de su apartamento.

El señor Ramos Alverio sostuvo que, en el año 2014, le informó al Consejo de Titulares que en su apartamento comenzaron a surgir varias filtraciones en el techo.[3] A esos fines, el 7 de junio de 2014, la parte recurrente celebró una asamblea extraordinaria en la que obtuvo la aprobación de los titulares para realizar una derrama con relación a un tratamiento de impermeabilidad para los techos.[4] Asimismo, en la referida asamblea se acordó que los

---

[2] *Íd.*, Anejo VII, págs. 109-112.
[3] Transcripción de prueba oral (TPO), pág. 24; líneas 6-10.
[4] *Íd.*, Anejo I, pág. 6.

titulares debían cumplir con el pago de la derrama en el término de dos (2) años. El recurrente cumplió con el pago.[5]

Así las cosas, en septiembre de 2017, en virtud de que el apartamento era habitable, el señor Ramos Alverio decidió rentar el apartamento con el fin de generar ingresos.[6] Empero, en ese mes, las referidas filtraciones se agravaron por el paso del Huracán María por Puerto Rico.[7] Ante los daños generados por el impacto del huracán, durante el año 2017 e inicios del 2018, el recurrente mitigó los daños que sufrió el apartamento.[8]

El 9 de mayo de 2018, el recurrido le reclamó al Consejo de Titulares una suma de dinero en virtud de que había mitigado los daños ocasionados por las filtraciones.[9] Una vez más, el 17 de julio de 2018, el señor Ramos Alverio le notificó a la parte recurrente sobre los daños que sufrió el apartamento a consecuencia de las filtraciones.[10] Al culminar el año 2018, el arrendatario del señor Ramos Alverio canceló el contrato de arrendamiento debido a que el apartamento no estaba acondicionado para vivir como consecuencia de las filtraciones.[11]

Ante este cuadro y los reclamos de varios titulares acerca de las filtraciones, el 18 y 19 de mayo de 2019, el Consejo de Titulares celebró una asamblea extraordinaria en la que informó que en junio de 2019 comenzarían las reparaciones de los techos.[12] El 29 de mayo de 2019, el Consejo de Titulares logró transigir una reclamación ante MAPFRE por los daños provocados por el Huracán María y le notificó a los titulares la suma de dinero aprobada por la aseguradora.[13] Consecuentemente, en junio de 2019, comenzaron

---

[5] TPO, pág. 742; líneas 18-21.
[6] Íd., pág. 154; líneas 17-21.
[7] Íd., pág. 512; líneas 1-5.
[8] Íd., pág. 159; líneas 7-12.
[9] Íd., pág. 67; líneas 19-25.
[10] Íd., pág. 69; líneas 3-8.
[11] Íd., pág. 144, líneas 10-12.
[12] Íd., pág. 90; líneas 18-25; pág. 91; línea 1.
[13] Íd., pág. 346, líneas 14-19; Íd. pág. 671; líneas 7-13.

las labores para reparar los daños provocados por el Huracán María.[14]

En julio de 2019, el señor Ramos Alverio instó en Banco Popular una acción de "loss mitigation" ante los gastos incurridos en los arreglos de las filtraciones.[15] Banco Popular aceptó la solicitud de mitigación.[16]

Nuevamente, en agosto de 2019, el recurrido volvió a mitigar los daños que sufrió su apartamento y le informó al Consejo de Titulares acerca de las filtraciones.[17] En octubre de 2019, comenzaron a realizar las reparaciones en el techo del edificio del señor Ramos Alverio.[18]

El 28 de octubre de 2019, el recurrido le cursó una misiva al Consejo de Titulares en la que nuevamente le reclamó los gastos que ha incurrido en reparar el apartamento y la inacción por parte de dicho cuerpo directivo en atender las filtraciones.[19]

En esa línea, a lo largo de los meses de octubre, noviembre y diciembre de 2019 y, enero y febrero de 2020, el recurrido continuó formalmente redactándole cartas al Consejo de Titulares en aras de obtener un remedio económico.[20]

Así pues, el 5 de febrero de 2020, el Consejo de Titulares le respondió informándole que tenía una deuda de mantenimiento y, por tanto, no le podían hacer entrega de un cheque reembolsando los gastos de mitigación en que incurrió el recurrido.[21] También la parte recurrente sostuvo que las labores para corregir los techos no habían culminado.[22]

---

[14] *Íd.*, pág. 681, líneas 2-6.
[15] *Íd.*, pág. 422, líneas 2-5.
[16] *Íd.*, pág. 557, líneas 21-25.
[17] *Íd.*, pág. 176; líneas 5-7.
[18] *Íd.*, pág. 92; líneas 5-8.
[19] *Íd.*, pág. 303; líneas 14-19.
[20] *Íd.*, pág. 105, líneas 20-24.
[21] *Íd.*, pág. 107, líneas 2-8.
[22] *Íd.*, líneas 16-20.

Luego, el 25 de marzo de 2020, el recurrido le envió un correo electrónico al Consejo de Titulares en la que le aclaró que no había pagado la cuota de mantenimiento debido a que su dinero lo había destinado en la reparación del techo del apartamento.[23]

En mayo de 2020, el recurrido cursó un correo electrónico en el que preguntó al Consejo de Titulares cuando se haría el tratamiento de techo de su edificio, pero no recibió una respuesta.[24]

A esos efectos, desde noviembre de 2020 a julio de 2021, el señor Ramos Alverio invirtió una suma sustancial de dinero en corregir las deficiencias que sufría el techo de su apartamento por las filtraciones y humedad.[25]

Ante la dilación en atender las filtraciones de su techo, y las diversas cartas que le remitía el señor Ramos Alverio a la parte recurrente en busca de un remedio, el recurrido instó una *Querella* ante el DACO.[26] El señor Ramos Alverio solicitó una indemnización económica por la cantidad de $45,028.00 en concepto de los daños ocasionados por las filtraciones y los gastos en que incurrió para mitigar los daños.

El 15 de marzo de 2022, el Consejo de Titulares radicó una *Contestación a querella* en la que alegó que las filtraciones surgieron debido a que la parte recurrida no fue diligente en hacer los mantenimientos necesarios para evitar las filtraciones en su techo.[27]

Tras las vistas administrativas, celebradas los días 10, 11 y 12 de octubre de 2023, el 27 de octubre de 2023, la parte recurrente radicó una *Moción solicitando desestimación luego de presentada toda la prueba.*[28] En lo pertinente, el Consejo de Titulares alegó que, luego de presentada toda la prueba documental y testifical en las

---

[23] *Íd.*, pág. 115, líneas 7-15.
[24] *Íd.*, pág. 108, líneas 3-6.
[25] *Íd.*, pág. 254, líneas 10-15; *Íd.*, pág. 256, líneas 1-5.
[26] Apéndice del Recurso de Revisión Administrativo, Anejo I, págs. 1-17.
[27] *Íd.*, Anejo VIII, págs. 113-114.
[28] *Íd.*, Anejo V, págs. 55-80.

vistas administrativas, el señor Ramos Alverio no demostró que la falta de mantenimiento en los techos del condominio ocasionó que el techo de su apartamento sufriera filtraciones. Asimismo, indicó que estos fueron diligentes con la aseguradora en reclamar los daños generados por el Huracán María. No obstante, arguyó que el recurrido no presentó la *Querella* dentro del término prescriptivo establecido en el anterior Art. 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA sec. 5141 y los términos prescriptivos establecidos en la *Ley de Condominios de Puerto Rico* (en adelante, *Ley de Condominios*), Ley Núm. 129-2020, 31 LPRA sec. 1921 *et. seq.* Consecuentemente, procedía desestimar la causa de acción instada por el recurrido.

El 13 de noviembre de 2023, el recurrido presentó una *Oposición a "moción solicitando desestimación luego de presentada toda la prueba en vista administrativa"* en la que arguyó que le correspondía a la parte recurrente el mantenimiento de los techos de los apartamentos.[29] Además, el señor Ramos Alverio razonó que los techos eran áreas comunes, por lo que le correspondía a la parte recurrente mantenerlos en condiciones óptimas.

Ante las mociones presentadas, no tenemos constancia sobre la determinación de DACO en cuanto a la *Moción solicitando desestimación luego de presentada toda la prueba.*

Luego de varios incidentes procesales, el 10 de febrero de 2025, notificada el 11 de febrero de 2025, el DACO emitió una *Resolución*[30] en la que formuló las siguientes determinaciones de hecho:

> 1. El Querellante es el titular del apartamento KF-PH (en lo sucesivo el "Apartamento") en el Condominio Castillo del Mar (en lo sucesivo el "Condominio") ubicado en el municipio de Ceiba, Puerto Rico. El Querellante adquirió el Apartamento en febrero de 2003. El Condominio es un complejo de apartamentos de uso residencial que se encuentra sometido al Régimen de Propiedad Horizontal.

---

[29] *Íd.*, Anejo VI, págs. 81-108.
[30] *Íd.*, Anejo I, págs. 1-17.

2. Para el año 2014 el Querellante le reclamó personalmente al Querellado por los problemas de filtraciones provenientes del techo que estaba afectando el Apartamento.

3. El 20 de mayo de 2014 el Querellado envió una Convocatoria a todos los titulares del Condominio para la celebración de una asamblea extraordinaria a llevarse a cabo el 7 de junio de 2014. Entre los asuntos a discutirse en la asamblea extraordinaria se encontraba el sellado de techos en áreas comunes y la pintura de los edificios. Esto debido a los múltiples reclamos de los titulares debido a filtraciones en los techos y falta de mantenimiento a los edificios del Condominio.

4. Como parte de los acuerdos alcanzados en la asamblea extraordinaria de junio de 2014, los titulares autorizaron una derrama a pagarse en 24 meses para sufragar el servicio de impermeabilización de los techos y la pintura de los edificios. Al Apartamento del Querellante le correspondía un pago por concepto de derrama de $2,828.68.

5. En septiembre de 2017 Puerto Rico sufrió los daños ocasionados por el Huracán María. El Apartamento sufrió daños considerables debido a ser un "Penthouse" y estar ubicado en la costa este de la isla. Los efectos del Huracán María agravaron las filtraciones de los techos y las condiciones en las que se encontraban los edificios.

6. El Querellante procedió a reparar los daños en el interior del Apartamento que había ocasionado el Huracán María con el objetivo de hacerlo habitable. En ese momento el Apartamento se encontraba arrendado a un inquilino.

7. El 14 de agosto de 2018 el Querellante le notificó nuevamente al Querellado mediante correo electrónico que el Apartamento continuaba sufriendo daños relacionados a las filtraciones que provenían del techo que constituye un elemento común del Condominio.

8. Para octubre de 2018 el Querellante suscribió un Contrato de Arrendamiento con Mark Augustiniak (en lo sucesivo el "Inquilino") para alquilarle el Apartamento durante el periodo del 1 de septiembre de 2018 al 31 de agosto de 2019. El pago mensual por el arrendamiento del Apartamento era de mil dólares ($1,000.00).

9. El 14 de diciembre de 2018 el Inquilino le cursó una Carta al Querellante mediante la cual canceló el Contrato de Arrendamiento efectivo al 31 de diciembre de 2018. El inquilino justificó la cancelación del arrendamiento debido al serio problema de filtraciones de agua que presentaba el Apartamento. Las constantes filtraciones de agua que provenían del techo representaban un riesgo para la salud y la seguridad del Inquilino y sus familiares.

10. La cancelación del Contrato de Arrendamiento del Apartamento le causó al Querellante una pérdida de ingresos por concepto de renta por la cantidad de ocho mil dólares ($8,000.00) que corresponden a las ocho mensualidades de enero 2019 a agosto 2019.

11. El 21 de mayo de 2019 el Querellante le envió un correo electrónico al Querellado notificándole sobre el problema de filtraciones que tenía el techo del Apartamento.

12. El 1 de agosto de 2019 el Querellante le envió un correo electrónico al Administrador del Condominio notificándole y dándole seguimiento a los reclamos por las filtraciones que afectaban el Apartamento.

13. El 15 y 16 de agosto de 2019 el Querellante le envió un correo electrónico al Administrador del Condominio reiterando sus reclamos por el problema de filtraciones y haciendo constar los daños que estaba presentando el Apartamento.

14. El 27 de octubre de 2019 el Querellante le cursó una Carta al Querellado y al Administrador donde nuevamente

reclama para que se atienda el problema de filtraciones provenientes del techo.

15. El Querellado le informó a los titulares que el trabajo para la impermeabilización de los techos comenzaría para finales del 2019 pero no fue hasta marzo de 2022 que se finalizaron los trabajos.

16. El 25 de marzo de 2020 el Querellante le envió un correo electrónico al Querellado y al Administrador reclamando una respuesta a las reiteradas comunicaciones relacionadas al problema de filtraciones. El 20 de mayo de 2020 el Querellante le envió otro correo electrónico al Administrador indagando sobre el estatus del trabajo de impermeabilización de los techos de los edificios.

17. El 7 de diciembre de 2020 el Querellante, a través de su representación legal, le notificó una reclamación extrajudicial al Querellado donde le reclamaba una indemnización económica por los daños del Apartamento y la renta dejada de percibir a causa del problema de filtraciones. El Querellado no respondió la reclamación extrajudicial.

18. Durante el 2021 el Querellante incurrió en gastos ascendentes a la cantidad de ocho mil ciento veintisiete dólares con sesenta y dos centavos ($8,127.62) entre materiales y mano de obra para reparar los daños ocasionados por las constantes filtraciones de agua. Entre los daños ocasionados por las filtraciones de agua se encuentran los siguientes: humedad, hongo, gabinetes de cocina dañados, puertas de cuartos dañadas, pintura levantada, desprendimiento de empañetados, entrada de agua a tubería eléctrica, delaminaciones, corrosión en algunas varillas y desprendimiento de hormigón.

19. Inconforme con la situación, el Querellante presentó la Querella de epígrafe el 9 de marzo de 2021. La Querella fue notificada a las partes el 15 de marzo de 2021. En su Querella el Querellante alega que el Querellado incumplió su obligación de conservar y mantener los elementos comunes del Condominio y desatendió los múltiples reclamos por el problema de filtraciones que afectaba el Apartamento. Como remedio el Querellante solicita una indemnización económica por la cantidad de cuarenta y cinco mil veintiocho dólares ($45,028.00).

20. El Querellante contrató al Ingeniero Roberto Marte de la Mota (en los sucesivo el "Ingeniero Marte") para que realizara una evaluación estructural del Apartamento y rindiera un informe pericial. El 17 de junio de 2022 el Ingeniero Marte visitó el Apartamento para realizar varias pruebas de campo y rindió un Informe Pericial con fecha del 28 de junio de 2022. Para el 17 de junio de 2022 ya el Querellado había finalizado la aplicación del sistema de impermeabilización en el techo del Apartamento del Querellante.

21. Del Informe Pericial del Ingeniero Marte se concluye que los daños que sufrió el interior del Apartamento fueron a causa del problema de filtración que sufrió la losa de hormigón del nivel de techo del Apartamento. Las filtraciones en un elemento común como lo es la lasa de hormigón del techo del Apartamento causaron humedad, hongo, gabinetes de cocina dañados, puertas de cuartos dañadas, levantamiento de pintura, desprendimiento de empañetado, entrada de agua a tubería eléctrica, delaminaciones, corrosión de algunas varillas y desprendimiento de hormigón al interior del Apartamento.

22. De su evaluación el Ingeniero Marte concluye que el Condominio adolece de vicios ocultos de construcción que provocan un problema agudo de filtraciones en el techo que obligan al Querellado a tener que dar un tratamiento de impermeabilización y mantenimiento continuo. Los vicios de

construcción identificados por el Ingeniero Marte son los siguientes: concreto con 2,500psi lo que constituye un concreto de baja calidad, débil y poroso; deficiencia en la ubicación de la varilla del techo y drenajes de techo mal ubicados y con diámetro muy pequeño para un funcionamiento adecuado.

23. Como recomendación para atender el problema de filtraciones, el Ingeniero Marte recomienda: contratar un ingeniero mecánico/hidráulico para la verificación de captación del techo y capacidad de manejo de agua pluvial de los drenajes existentes y la aplicación de un sistema de impermeabilización en los techos de los edificios con un mantenimiento de cada tres años.

24. Como parte de su Informe Pericial, el Ingeniero Marte incluyó una Opinión de Costos (Cost Opinion) actualizada para reparar los daños del Apartamento, la cual se basó en los datos provistos por el Ingeniero José González quien fue contratado por el Querellado para los estimados relacionados a los daños del Huracán María. El estimado de costos directos según el Ingeniero Marte asciende a la cantidad $26,649. De dicho estimado de costos procede eliminar las partidas de "Slinding door $390" y "Losetas piso-loseta, remoción e instalación--$9,600". La eliminación de esas dos partidas reduce el costo directo de reparaciones de $26,649 a $16,659.

25. Desde el 2014 el Querellado recibió reclamaciones de los titulares referente a los problemas de filtraciones que presentaban los techos de los edificios. En junio de 2014 el Querellado celebró una asamblea extraordinaria donde obtuvo la aprobación de los titulares para imponer una derrama para costear un tratamiento de impermeabilización para los techos y la pintura de los edificios, pero no fue hasta octubre de 2019 que se comenzó con el sellado de techos lo cual se vio interrumpido por la Pandemia de Covid-19. El Querellante tuvo que esperar hasta el 4 de marzo de 2022 para que el Querellado finalizara de sellar el techo de su Apartamento.[31]

El DACO resolvió que ante los múltiples reclamos del señor Ramos Alverio, el Consejo de Titulares incumplió con su deber de velar por los elementos comunes que comprenden el Condominio Castillos del Mar. Asimismo, el DACO determinó que, ante la prueba desfilada en las vistas administrativas, el Consejo de Titulares fue negligente en no atender los reclamos del recurrido. Además, decretó que, ante los daños provocados por las filtraciones debía indemnizar al recurrido por el monto de $32,786.62. Cónsono con lo anterior, el DACO ordenó que el Consejo de Titulares pagara la referida indemnización en el término de 30 días a partir de la notificación de la *Resolución.*

---

[31] *Íd.*, Anejo I, págs. 1-6.

El 20 de febrero de 2025, la parte recurrida radicó un *Memorando de costas* en el que solicitó el pago de las costas y gastos incurridos en el trámite administrativo.[32]

El 25 de febrero de 2025, el Consejo de Titulares instó ante el DACO una *Moción de reconsideración.*[33]  En síntesis, alegó que el DACO erró en su aplicación del derecho con respecto a la prueba desfilada en las vistas administrativas.  Además, argumentó que el DACO omitió varios hechos presentados en la vista en su análisis del derecho aplicable.  Ello, puesto que la parte recurrida no presentó su reclamo dentro del término prescriptivo establecido en la *Ley de Condominios, supra.*

El 10 de marzo de 2025, el DACO emitió y notificó una *Resolución* en la que concedió la cantidad de $3,728.13 en concepto de costas.[34]

Posteriormente, el 11 de marzo de 2025, notificada el 12 de marzo de 2025, el DACO emitió una *Resolución* denegando la *Moción de reconsideración* radicada por la parte recurrente.[35]

Inconforme con la decisión, el 4 de abril de 2025, la parte recurrente instó el recurso que nos ocupa y apuntó los siguientes señalamientos de error:

> PRIMER ERROR: ERRÓ EL HONORABLE DACO A TRAVÉS DE SU JUEZ ADMINISTRATIVO, LCDO. JORGE L. ROJAS PLAZA, YA QUE VIOLENTÓ LOS DERECHOS DEL CONSEJO DE TITULARES DEL CONDOMINIO CASTILLOS DEL MAR Y SU DEBIDO PROCESO DE LEY EN LA ADJUDICACIÓN DEL PRESENTE CASO, ASÍ COMO DECLARAR NO HA LUGAR LA RECONSIDERACIÓN, AL NO SER EL JUEZ ADMINISTRATIVO QUE PRESIDIÓ Y PRESENCIÓ LAS VISTAS DEL CASO, NI TUVO ANTE SÍ LA EVIDENCIA DE LAS PARTES, NI LOS TESTIMONIOS EN SALA.
>
> SEGUNDO ERROR: ERRÓ EL HONORABLE DACO A TRAVÉS DE SU JUEZ ADMINISTRATIVO, LCDO. JORGE L. ROJAS PLAZA, YA QUE ÉSTE OMITIÓ EN SU ANÁLISIS DE LOS HECHOS, EL DERECHO APLICABLE A LAS DIFERENTES CONTROVERSIAS DEL PRESENTE CASO PLANTEADAS ANTE DICHO FORO, TANTO EN EL CASO

---

[32] *Íd.*, Anejo II, págs. 18.
[33] *Íd.*, Anejo III, págs. 21-52.
[34] Íd., Anejo II, págs. 18-20.
[35] Íd., Anejo IV, págs. 53-54.

PRESENTADO EN LAS VISTAS DEL MISMO, COMO EN LA RECONSIDERACIÓN PRESENTADA.

TERCER ERROR: ERRÓ EL HONORABLE DACO A TRAVÉS DE SU JUEZ ADMINISTRATIVO, LCDO. JORGE L. ROJAS PLAZA, AL DECLARAR CON LUGAR EL MEMORANDO DE COSTAS DE LA PARTE QUERELLANTE, SIN DAR LA OPORTUNIDAD AL CONSEJO DE TITULARES DE PRESENTAR SU OPOSICIÓN AL MISMO Y EL CASO NO SER UNO FINAL Y FIRME.

**II.**

**A.**

Es norma firmemente establecida que los tribunales apelativos han de conceder gran consideración y deferencia a las decisiones de los organismos administrativos. Ello, dado que las agencias administrativas cuentan con vasta experiencia y conocimiento especializado en cuanto a los asuntos que les han sido encomendados. *Moreno Lorenzo y otros v. Depto. Fam.*, 207 DPR 833, 839 (2021), citando a *OCS v. Universal*, 187 DPR 164, 178 (2012); *The Sembler Co. v. Mun. de Carolina*, 185 DPR 800 (2012); *Pagán Santiago et al. v. ASR*, 185 DPR 341, 358 (2012).

Como resultado, la decisión de una agencia administrativa gozará de una presunción de legalidad y corrección que será respetada, siempre que la parte que la impugna no produzca evidencia suficiente para rebatirla. *Transp. Sonnell v. Jta. Subastas ACT,* 214 DPR 633 (2024); *Batista, Nobbe v. Jta. Directores*, 185 DPR 206, 215 (2012). Así, en cuanto a las determinaciones de hecho que realiza una agencia, el Tribunal Supremo ha resuelto que los tribunales revisores tienen que sostenerlas si se encuentran respaldadas por evidencia suficiente que surja del expediente administrativo al ser considerado en su totalidad. *Pacheco v. Estancias*, 160 DPR 409, 432 (2003). Véase, además, Sec. 4.5 de la LPAU, 3 LPRA sec. 9675. Las determinaciones de hecho serán sostenidas por el tribunal, si se basan en evidencia sustancial que no obra en el expediente administrativo. *Vázquez v. Consejo de Titulares*, 216 DPR ___ (2025), 2025 TSPR 56. Por evidencia

sustancial se entiende "aquella evidencia relevante que una mente razonable podría aceptar como adecuada para sostener una conclusión". *Rolón Martínez v. Supte. Policía*, 201 DPR 26, 36 (2018); *González Segarra et al. v. CFSE*, 188 DPR 252, 277 (2013); *Otero v. Toyota*, 163 DPR 716, 728-729 (2005).

Por lo tanto, la parte afectada deberá reducir el valor de la evidencia impugnada o demostrar la existencia de otra prueba que sostenga que la actuación del ente administrativo no estuvo basada en evidencia sustancial. *Otero v. Toyota*, supra, pág. 728. En fin, el tribunal debe limitar su intervención a evaluar si la determinación de la agencia es razonable, ya que se persigue evitar que el tribunal revisor sustituya el criterio de la agencia por el suyo. *Íd.*

Por otro lado, respecto a las conclusiones de derecho, la *Ley de Procedimiento Administrativo Uniforme del Gobierno de Puerto Rico*, Ley Núm. 38-2017, señala que éstas pueden ser revisadas en todos sus aspectos. Sec. 4.5 de la LPAU, 3 LPRA sec. 9675. Las conclusiones de derecho serán revisables en todos sus aspectos por un tribunal. *Vázquez v. Consejo de Titulares*, *supra*. La interpretación de la ley es una tarea que le corresponde a los tribunales y como corolario, los tribunales deben revisar las conclusiones de derecho en todos sus aspectos. *Vázquez v. Consejo de Titulares, supra*. Ello, como mecanismo interpretativo del poder judicial. *Íd.* Ahora bien, lo anterior "no implica que los tribunales revisores tienen la libertad absoluta de descartar libremente las conclusiones e interpretaciones de la agencia". *Otero v. Toyota*, supra, pág. 729. Consecuentemente, cuando un tribunal llega a un resultado distinto al de la agencia, éste debe determinar si la divergencia es a consecuencia de un ejercicio razonable y fundamentado de la discreción administrativa, ya sea por la pericia, por consideraciones de política pública o en la apreciación de la prueba. *Íd.* Dicho de otro modo, "[e]l tribunal podrá sustituir el

criterio de la agencia por el propio solo cuando no pueda hallar una base racional para explicar la decisión administrativa". *Íd.*

Por consiguiente, la deferencia concedida a las agencias administrativas únicamente cederá cuando: (1) la determinación administrativa no esté basada en evidencia sustancial; (2) el organismo administrativo haya errado en la aplicación o interpretación de las leyes o los reglamentos que se le ha encomendado administrar; (3) cuando el organismo administrativo actúe arbitraria, irrazonable o ilegalmente, al realizar determinaciones carentes de una base racional; o, (4) cuando la actuación administrativa lesione derechos constitucionales fundamentales. *Super Asphalt v. AFI y otro,* 206 DPR 803, 819 (2021); *Torres Rivera v. Policía de PR,* 196 DPR 606, 628 (2016); *IFCO Recycling v. Aut. Desp. Sólidos,* 184 DPR 712, 744-745 (2012).

**B.**

La sección 3.3 de la Ley de Procedimiento Administrativo (en adelante, LPAU) Ley Núm. 38 de 30 de junio de 2017, según enmendada, 3 LPRA sec. 9643 (Ley Núm. 38-2017), establece que:

> Toda agencia podrá designar oficiales examinadores para presidir los procedimientos de adjudicación que se celebren en ella, los cuales no tendrán que ser necesariamente abogados, particularmente cuando el procedimiento en cuestión es uno informal. El jefe de la agencia podrá delegar la autoridad de adjudicar a uno o más funcionarios o empleados de su agencia. A estos funcionarios o empleados se les designará con el título de jueces administrativos. En casos cuyos hechos planteen controversias adjudicables bajo la autoridad de más de una agencia, los jefes de las agencias concernidas podrán delegar en un solo juez administrativo la adjudicación del caso, el cual podrá ser funcionario o empleado de cualesquiera de dichas agencias.

La LPAU le confiere a los jefes de agencia poder delegar su función de presidir las vistas adjudicativas administrativas. *Com. Seg. v. Real Legacy Assurance,* 179 DPR 692, 709 (2010). El oficial examinador es aquel funcionario designado para presidir una vista, sin poder de adjudicación. *AEE v. Rivera,* 167 DPR 201, 220 (2006). En cambio, si se delega la función de presidir y adjudicar, se nombró

a un juez administrativo para presidir la vista. *Com. Seg. v. Real Legacy Assurance*, supra, pág. 709. Como parte de sus funciones, el oficial examinador puede presidir el proceso, recibir evidencia ofrecida por las partes, garantizar que se cumpla con las normas procesales y se conduzca el proceso en forma justa y equitativa. *AEE v. Rivera*, supra, pág. 220. Una vez el oficial examinador escucha la prueba testifical y recibe la prueba documental, este rinde un informe al funcionario que tiene la autoridad para adjudicar, el juez administrador o jefe de la agencia. *Íd.* Asimismo, el oficial examinador es el adjudicador de los hechos en controversia durante el transcurso de la vista evidenciaria. *Com. Seg. v. Real Legacy Assurance*, supra, pág. 710. Sin embargo, una vez aquilatada la prueba, el oficial examinador realiza una recomendación al juez administrativo, la cual puede ser acogida o rechazada. *Íd.*

No obstante, quien adjudica la controversia es el juez administrador, quien el jefe de agencia le puede delegar la facultad de adjudicar. *AEE v. Rivera*, supra, pág. 220. Se debe tener en consideración que el oficial examinador es quien delimita los asuntos en controversia y ha formado el expediente sobre el cual el juez administrativo se basará para tomar la decisión final. *Com. Seg. v. Real Legacy Assurance*, supra, pág. 711.

### C.

El anterior Art. 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 5141, aplicable al presente caso, establecía que, "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización". Para prosperar en una acción de daños se requiere que se lleve a cabo una actuación u omisión culposa o negligente; que se ocasiona un daño y que exista una relación causal entre la acción y omisión

y el daño ocasionado. *Hernández Vélez v. Televicentro,* 168 DPR 803, 831 (2006); *Elba ABM v. UPR,* 125 DPR 294, 308 (1990); *Hernández v. Fournier,* 80 DPR 93,96 (1957).

Por otro lado, la prescripción es una figura que extingue un derecho debido a que una parte no lo ejerce en un período de tiempo determinado. *Rivera Ruiz et al. v. Mun. de Ponce et al.,* 196 DPR 410, 415 (2016); *Fraguada Bonilla v. Hosp. Aux. Mutuo,* 186 DPR 365, 372-373 (2012). El término para ejercer las acciones se puede interrumpir ejerciendo la acción ante los tribunales, reclamación extrajudicial del acreedor y por cualquier reconocimiento de deuda por el deudor. *Rivera Ruiz v. Mun. de Ponce, supra,* pág. 415. El término prescriptivo dispuesto en el Art. 1868 del Código Civil de 1930, 31 LPRA sec. 5298, establece que el término prescriptivo comienza a transcurrir desde que el agraviado tuvo conocimiento o debió haber tenido conocimiento del daño y estuvo en posición para instar una casusa de acción. Ahora bien, una de las formas para interrumpir el término prescriptivo es la reclamación extrajudicial. Los requisitos para que se constituya una reclamación extrajudicial son los siguientes: (a) La reclamación debe ser oportuna, lo cual requiere que se realice antes de la consumación del plazo, (b) Es necesaria la legitimación del reclamante. Ello requiere que la reclamación se haga por el titular del derecho o acción cuya prescripción quiere interrumpirse, (c) Se requiere idoneidad del medio utilizado para realizar la reclamación y (d) Por último, debe existir identidad entre el derecho reclamado y aquél afectado por la prescripción. *De León v. Caparra Center,* 147 DPR 797, 805 (1999). Este Tribunal de Apelaciones ha resuelto en múltiples ocasiones que un correo electrónico y una carta puede constituir un método para efectuar una reclamación extrajudicial. *Aguakem Caribe, Inc. v. Baxter Healthcare Corporation of Puerto Rico,* KLAN0801989.

En atención a la controversia ante nos conviene destacar los daños continuos. Cónsono con lo anterior, este Tribunal de Apelaciones ha resuelto que las filtraciones en un techo constituyen daños continuos. *Medina Ocasio y Otros v. Stevens y Otros*, KLRA201301254. Los daños continuados han sido definidos como "producidos por uno o más actos culposos o negligentes imputables al actor, coetáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas, duraderas sin interrupción, unidas entre sí, las cuales al ser conocidas hacen que también se conozca —por ser previsible— el carácter continuado e ininterrumpido de sus efectos, convirtiéndose en ese momento en un daño cierto compuesto por elementos de un daño actual (aquel que ya ha acaecido), y de daño futuro previsible y por tanto cierto". *Rivera Prudencio v. Mun. de San Juan*, 170 DPR 149, 167 (2007). Estos se caracterizan por ser producidos por uno o más actos culposos o negligentes imputables al actor, simultáneos o no, que resultan en consecuencias lesivas ininterrumpidas, sostenidas y duraderas. *Rivera Prudencio v. Municipio de San Juan*, 170 DPR 149 (2007). **Por su naturaleza, el término prescriptivo para reclamar este tipo de daño comienza a correr cuando se verifique el último de los actos o se produzca el resultado definitivo**. *Íd.*

### D.

El Art. 2 de la *Ley de Condominios de Puerto Rico* (en adelante, *Ley de Condominios*), Ley Núm. 129-2020, 31 LPRA sec. 1921a, establece que, la ley se aprobó con el propósito, entre otros, de viabilizar la propiedad individual sobre un apartamento, que forma parte de un edificio o inmueble sometido al Régimen de Propiedad Horizontal. La *Ley de Condominios* provee mecanismos para los conflictos inevitables que surgen del *modus vivendi* bajo un régimen de propiedad horizontal. *Srio. DACO* v. *J. Condóminos C. Martí*, 121 DPR 807, 814 (1988). Asimismo, otro propósito que tiene la ley

es la creación de un marco organizacional de un gobierno interno y canalizar los problemas de la vida comunitaria. *Íd.*, pág. 815. La ley detalla el marco organizacional del gobierno interno, cuyo organismo rector y deliberativo es el Consejo de Titulares que a su vez rige, según la Ley de Propiedad Horizontal, la escritura matriz y el reglamento. *Íd.*

De otra parte, la Junta de Directores es el órgano ejecutivo que dirige (o la persona, en caso del Director), y supervisa la gestión administrativa del edificio de acuerdo a las directrices contenidas en la escritura, en el Reglamento y en los acuerdos del Consejo de Titulares. M. J. Godreau, *El condominio: el régimen de propiedad horizontal en Puerto Rico,* 3era ed., San Juan, PR, Ediciones SITUM, 2023, pág. 235. La responsabilidad fundamental de la Junta de Directores es velar por el buen funcionamiento de los condominios logrando que se ejecuten las disposiciones de la ley, de la Escritura Matriz, del Reglamento del Condominio, así como los acuerdos que se hayan aprobado en reuniones debidamente convocadas por el Consejo de Titulares. *Consejo Titulares* v. *Gómez Estremera et al.*, 184 DPR 407, 418 (2012). Como parte de las funciones del Consejo de Titulares es velar por el mantenimiento de los techos que es un elemento común general. *Consejo Tit. Cond. McKinley Court v. Rullán,* 126 DPR 387 (1990). El Consejo de Titulares es el responsable de la conservación y reparación de los techos al ser un elemento común. M. Godreau, *El condominio: El régimen de propiedad horizontal,* 2a ed., San Juan, Ed. Situm, 2019, págs. 163-166.

La *Ley de Condominios* le encomendó a DACO la rápida adjudicación de reclamos de los condómines relativos a la administración del edificio. *Consejo Titulares* v. *Gómez Estremera et al.*, supra, pág. 420. Se puede presentar ante DACO, las acciones de impugnación de los acuerdos del Consejo de Titulares, de las

determinaciones, actuaciones u omisiones del Director o de la Junta de Directores, relacionadas con la administración de inmuebles que comprendan por lo menos un apartamento destinado a vivienda. *Amil v. J. Dir. Cond. Pumarada*, 156 DPR 495, 500 (2002).

El Artículo 65 de la *Ley de Condominios*, 31 LPRA sec. 1923j, dispone un término para impugnar las acciones de la Junta de Directores y determinaciones del Consejo de Titulares. Dicho artículo expresa que:

> Las acciones u omisiones de la Junta de Directores, del Administrador Interino, del Agente Administrador así como los acuerdos del Consejo de Titulares podrán ser impugnados por los titulares en los siguientes supuestos:
>
> (a) cuando sean contrarios a esta Ley, la escritura matriz y reglamento del condominio;
>
> (b) cuando resulten gravemente perjudiciales a los intereses de la comunidad o a un titular;
>
> (c) cuando resulten gravemente perjudiciales para algún titular que no tenga obligación jurídica para soportarlo y no haya sido previsible al momento de la compra.
>
> Los titulares que sean dueños de apartamentos en condominios que sean dedicados exclusivamente a uso comercial, tendrán que presentar la impugnación ante el Tribunal de Primera Instancia, el cual tendrá jurisdicción primaria y exclusiva. **En el caso que los titulares sean dueños de apartamentos en condominios con al menos un apartamento de uso residencial, la jurisdicción será primaria y exclusiva del Departamento de Asuntos del Consumidor, así como cualquier reclamación presentada en contra del agente administrador**.
>
> Para todo tipo de impugnación se tendrán treinta (30) días contados a partir de la fecha en que se tomó dicho acuerdo o determinación, si se hizo en su presencia, o dentro de los treinta (30) días siguientes a la fecha en que recibe la notificación del acuerdo, si el titular afectado no estuvo presente en el momento en que se llegó a tal acuerdo o determinación.
>
> En el caso de que la acción de impugnación de acuerdos, acciones u omisiones de la Junta de Directores, del Administrador Interino, del Agente Administrador o del Consejo de Titulares, constituyan violaciones a las disposiciones de esta Ley, de la escritura matriz o del reglamento del condominio, **prescribirá a los dos (2) años**. El término se computará a partir de la fecha en que se tomó la acción, omisión o acuerdo si fue en la presencia del titular o a partir de la notificación de este si no fue en su presencia. El acuerdo tiene que haberse notificado conforme a las disposiciones de esta Ley.
>
> (...)

El término para ejercer la impugnación dependerá del supuesto bajo el que se presente. Si se trata de una impugnación de acuerdos, acciones u omisiones que constituyan una violación a la *Ley de Condominios, supra,* la acción prescribirá a los dos (2) años. Cónsono con lo anterior, la Regla 23 del *Reglamento de Condominios,* Reglamento Núm. 9386, pág. 19 (Reglamento Núm. 9386) establece que:

> Las acciones u omisiones de la Junta de Directores, Administrador Interino, Agente Administrador, Sindico, así como los acuerdos del Consejo de Titulares podrán ser impugnados ante el Departamento por los titulares en los siguientes supuestos:
> (a) Cuando sean contrarios a la Ley de Condominios de Puerto Rico, la escritura matriz, el reglamento del condominio y a este Reglamento.
> (b) Cuando resulten gravemente perjudiciales a los intereses de la comunidad o a un titular.
> (c) Cuando resulten gravemente perjudiciales para algún titular que no tenga obligación jurídica para soportarlo y no haya sido previsible al momento de la compra.

**E.**

La Sección 3.21 de la LPAU, 3 LPRA sec. 9661, estatuye que la agencia puede imponer sanciones, en su función cuasi judicial y en los siguientes casos como lo es imponer costas y honorarios de abogados, en los mismos casos que dispone la Regla 44.1 de Procedimiento Civil, *supra,* R. 44.1. La Regla 24 del *Reglamento de Procedimientos Adjudicativos del DACO,* Reglamento Núm. 8034, pág. 27 (Reglamento Núm. 8034) establece que "las Reglas de Procedimiento Civil y de Evidencia no serán de estricta aplicación a las vistas administrativas, sino en la medida en que el Funcionario o Panel de Jueces que presida la vista o el Departamento estime necesario para llevar a cabo los fines de la justicia". Así las cosas, la Regla 44.1(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1(a), consagra que las costas se concederán en favor de la parte que se resuelva el pleito. Las costas son los gastos que se incurra en la tramitación de un pleito o procedimiento. *Íd., Andino Nieves v. AAA, supra.* Sabido es que nuestras Reglas de Procedimiento Civil

disponen que "las costas se concederán a la parte a cuyo favor se resolvió el pleito". *Andino Nieves v. AAA,* 123 DPR 712, 716 (1989). Ahora bien, la Regla 44.1 (b), *supra,* R. 44.1 (b), indica que el pago de las costas se presentará dentro del término de diez (10) días a partir archivo en autos de copia de la notificación de la sentencia, una relación o memorándum de todas las partidas de gastos y desembolsos necesarios en que se incurrió durante la tramitación del pleito o procedimiento. Cualquier parte que no esté conforme con las costas reclamadas podrá impugnarlas en todo o en parte, dentro del término de diez (10) días contados a partir de aquel en que se le notifique el memorándum de costas. La Regla 27.4 del Reglamento Núm. 8034, pág. 29, dispone que:

> **En los casos en que el querellado perdidoso haya actuado con temeridad, el Departamento podrá ordenar el pago total o parcial**, a discreción del Funcionario, Secretario o Panel de Jueces que presida la vista administrativa en su adjudicación, de: (1) los gastos incurridos por el Departamento facturados por las entidades ajenas al Departamento que brindaron servicios solicitados durante la investigación y el procedimiento adjudicativo; (2) las dietas y millajes incurridas por el personal del Departamento según establecido en los Reglamentos aplicables y vigentes del Departamento de Hacienda; (3) cuando se utilice personal de la División de Pesas y Medidas se podrá recobrar gastos incurridos en investigación del Oficial a tenor con un "Servicio Solicitado" según establecido en el artículo cinco (5), seis (6), y siete (7) del Reglamento Tarifario, según enmendado, de la División Pesas y Medidas; (4) y además conllevará la imposición de todos los costos en los cuales el Departamento incurrió para hacer cumplir su resolución u orden.

(Énfasis suplido).

En suma, la LPAU y el Reglamento Núm. 8034 del DACO regulan la concesión de costas por parte de un juez administrativo sujetándolo a lo dispuesto en la Regla 44.1 de Procedimiento Civil, *supra,* R. 44.1, y su jurisprudencia interpretativa.

**III.**

En su primer señalamiento de error, la parte recurrente argumentó que su debido proceso de ley fue violentado dado que el Juez Administrativo no presidió la vista.

Según las normas jurídicas pormenorizadas, el oficial examinador es el funcionario a quién se le delega la función de aquilatar la prueba desfilada y organizar el expediente del caso administrativo para que el Juez Administrador adjudique la controversia. Asimismo, un oficial examinador está facultado para presidir una vista administrativa. Es decir, la LPAU, *supra*, autoriza al oficial examinador a presidir una vista administrativa, aunque no adjudique la controversia. Así pues, el Juez Administrativo es la persona delegada para adjudicar la controversia.

Contrario a lo alegado en su primer señalamiento de error, el DACO no le violentó el debido proceso de ley al Consejo de Titulares puesto que la LPAU, *supra*, permite que un oficial examinador presida la vista, aunque no sea quien adjudique la controversia. Estatutariamente se le ha encomendado dicha función al oficial examinador para facilitar la adjudicación del caso ante el Juez Administrativo.

En su segundo señalamiento de error, la parte recurrente indicó que el señor Ramos Alverio presentó la *Querella* ante el DACO, fuera del término prescriptivo de dos (2) años establecido en la *Ley de Condominios*, supra, para reclamar los daños ocasionados por las filtraciones. Ello, visto que las filtraciones en el techo comenzaron en el 2014 y la *Querella* fue incoada en el 2021. Por ende, el Consejo de Titulares alegó que el DACO omitió varios hechos en su análisis del derecho aplicable.

Según se desprende del derecho expuesto, el techo es un elemento común de un condominio y le corresponde al Consejo de Titulares atender su conservación. Sin embargo, este Tribunal ha resuelto que las filtraciones generan daños continuados. El término prescriptivo para incoar una acción por daños continuados comienza a decursar desde que ocurrió el último de los actos o cuando se produjo el resultado definitivo. Según discutido, el

término prescriptivo se puede interrumpir mediante la presentación de una causa de acción judicial o extrajudicialmente.

Ahora bien, el término prescriptivo que tiene un titular para ejercer un reclamo contra el Consejo de Titulares dependerá del supuesto bajo el que se presente. Si se trata de una causa de acción para impugnar acuerdos, acciones u omisiones que constituyen una violación a la *Ley de Condominios*, la escritura matriz o el reglamento del condominio, la acción prescribirá a los dos (2) años. Por otro lado, si versa acerca de una impugnación por otro supuesto que le resulte perjudicial a los intereses de cualquier titular, éste tendrá treinta (30) días a partir de la fecha en que se tomó el acuerdo o determinación, si fue en presencia del titular, o a partir de la fecha en que recibe la notificación del acuerdo, si no estuvo presente.

Establecido lo anterior, corresponde resolver si el señor Ramos Alverio presentó oportunamente la *Querella* ante DACO. Veamos.

De un examen minucioso, observamos que en el año **2014** el señor Ramos Alverio le reclamó oportunamente al Consejo de Titulares unas filtraciones que sufría su techo. Ante ello, ese mismo año, el Consejo de Titulares aprobó una derrama. En el año **2017**, aún el Consejo de Titulares no había iniciado las labores relacionadas a la derrama aprobada y el paso del Huracán María agravó las filtraciones en el apartamento del recurrido. Surge de la prueba documental que desde el año **2017** hasta el año **2020,** el recurrido le redactó varias cartas y correos electrónicos al Consejo de Titulares en aras de obtener una indemnización y que se atendieran las filtraciones. Empero, la derrama comenzó a efectuarse en el año **2019,** pero no iniciaron labores en el edificio del recurrido. En enero de **2021**, aún, no se había efectuado la derrama en el edificio del señor Ramos Alverio y ante la falta de inacción por parte del Consejo de Titulares el recurrido presentó

ante el DACO la referida *Querella.* Es menester señalar que, en el edificio del recurrido iniciaron la derrama en el **2022**.

Como es conocido, los daños generados por las filtraciones son considerados daños continuados. En el caso de epígrafe, el término prescriptivo no comenzó a transcurrir debido a que el daño no cesó. Es decir, el término prescriptivo para acudir ante el DACO comenzaba a transcurrir una vez el Consejo de Titulares realizara la derrama en el techo del recurrido y, por tanto, finalizaran las filtraciones. Ciertamente, la *Querella* fue presentada previo a que comenzara a decursar el término prescriptivo dado que la misma se efectuó en el **2022**.

De igual forma, el recurrido reclamó extrajudicialmente el daño que sufría su techo por las filtraciones desatendidas. Ciertamente, las comunicaciones que efectuaba el recurrido contenían el reclamo, solicitaban un remedio, eran dirigidas al Consejo de Titulares y fueron remitidas dentro del término prescriptivo de dos (2) años. Por tanto, el recurrido mantuvo vigente el término prescriptivo de dos (2) años para presentar una *Querella* en DACO ante la omisión del Consejo de Titulares en mantener el techo del condominio.

Destacamos que, los foros judiciales concedemos deferencia a las determinaciones de hecho de las agencias administrativas debido al conocimiento especializado que estas poseen. Sin embargo, nuestro Tribunal Supremo recientemente ratificó que los foros judiciales deben ejercer nuestra función interpretativa en cuanto a las conclusiones de derecho. *Vázquez v. Consejo de Titulares*, supra. Asimismo, indicamos que la parte recurrente no nos brindó a nuestra atención otra evidencia que nos persuadiera intervenir en las determinaciones de hechos.

Por último, en su tercer señalamiento de error, la parte recurrente planteó que el DACO no le permitió exponer su oposición al *Memorando de costas* instado por el señor Ramos Alverio.

No obstante, la citada regla indica que la parte que desee impugnar las costas reclamadas las podrá impugnar dentro del término de diez (10) días a partir desde que se notifique la presentación del memorándum de costas.

En el presente caso, el *Memorando de costas* fue presentado el **20 febrero de 2025** y la *Notificación* de la concesión de las costas fue emitida el **10 de marzo de 2025**. Atisbamos que, la parte recurrente tuvo la oportunidad de impugnar el *Memorando de costas,* pero no instó su oposición en el término establecido. Por ende, la parte recurrente no fue diligente en presentar dentro del término establecido su objeción al pago solicitado en concepto de costas.

A la luz de las anteriores normas, resulta inescapable la conclusión de que debemos confirmar la *Resolución* recurrida.

**IV.**

Por los fundamentos antes expuestos, confirmamos la *Resolución* recurrida y ordenamos que la parte recurrente cumpla con el pago de la indemnización impuesta por el DACO.

**Notifíquese.**

Lo acuerda y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones
